Durham v. State.

# DURHAM v. STATE.

## (*Nashville.* March 4, 1891.)

1. CRIMINAL LAW. *Imprisonment at hard labor as punishment for misdemeanor proper.*

   Judges of Courts of criminal jurisdiction have the power to impose sentence of imprisonment *at hard labor* in the county work-house as punishment for a misdemeanor. This power is conferred by § 6259 (M. & V.) Code, which reads as follows: "In all cases where a person is, by law, liable to be imprisoned in the county jail for safe-keeping or punishment, confinement in the work-house, if one be provided, may, in the discretion of the Court or Justice, be substituted."

   Code construed: § 6259 (M. & V.); § 5413 (T. & S.).

   Cases cited and approved: Eaton v. State, 15 Lea, 200; Atchison v. State, 13 Lea, 275; Wickham v. State, 7 Cold., 526.

   *Question reserved:* Is this statute valid so far as it authorizes confinement at *hard labor* of persons held only for safe-keeping.

2. SAME. *Same. Constitutional.*

   Statute authorizing Judges of Courts of criminal jurisdiction to punish misdemeanor convicts by imprisonment at *hard labor* in the county work-house does not violate that clause of the Constitution which provides that no one shall be "deprived of his life, liberty, or property, but by the judgment of his peers or the law of the land."

   Constitution construed: Art. I., Sec. 8.

3. SAME. *Code, § 6259 (M. & V.) is not repealed by work-house law of 1875.*

   So far as § 6259 (M. & V.) Code empowers Judges of Criminal Courts to imprison *at hard labor* in the county work-house as punishment for a misdemeanor, it is not repealed by the work-house law of 1875. The latter statute provides for imprisonment at *hard labor* for *fine and costs only,* and is not therefore inconsistent with the former law. It does not, in terms, repeal the former law, and does not purport to be and is not in fact a revision of the laws upon that subject.

Durham *v*. State.

Code construed: §§ 6259, 6264 *et al.* (M. & V.); § 5413 (T. & S.). (Acts 1875, Ch. 83.)

Cases cited and approved: Frazier *v*. Railroad, 88 Tenn., 140; 11 Wall., 88.

---

FROM SUMNER.

---

Appeal in error from the Circuit Court of Sumner County. A. H. MUNFORD, J.

J. J. TURNER for Durham.

Attorney-general PICKLE for State.

LURTON, J. Durham, under an indictment for murder, was convicted of an assault and battery. Judgment was thereupon entered on this verdict that he be confined in the county work-house at hard labor for three months, and that he pay a fine of fifty dollars and cost of prosecution. The fine and costs were at once secured, and execution ordered to issue for same. A transcript of the record, together with a petition for writ of error and supersedeas, was presented to a member of this Court, who ordered writs to issue as prayed for. It is now insisted that the Circuit Judge had no power to impose a sentence of imprisonment with hard labor under this verdict, and that, having secured the fine and costs, the petitioner

is entitled to be discharged. The conviction is for a misdemeanor at common law, and the power of the Circuit Judge to punish by a fine not. exceeding fifty dollars, where the fine is not fixed by the jury, and by imprisonment in the county jail not exceeding one year is not denied. *Wickham* v. *State*, 7 Cold., 526; *Atchison* v. *State*, 13 Lea, 275.

But it is very earnestly urged that hard labor cannot be imposed as a part of such sentence. By § 6259 M. & V. edition of Code, it is enacted that: "In all cases where a person is, by law, liable to be imprisoned in the county jail for safe-keeping or punishment, confinement in the work-house, if one be provided, may, in the discretion of the Court or Justice, be substituted."

A sentence to the work-house is a sentence to hard labor, whether expressly pronounced or not. It is conceded that if this provision of the Code is a valid and an existing law, that the judgment in this case was valid.

The first contention is that this law has, by implication, been repealed by an Act passed in 1875, and entitled "An Act to require persons convicted of misdemeanors to work out the cost of conviction."

First, it is said that the provision of the first section, providing that persons convicted of a misdemeanor "shall be confined in the county work-house after the term of his or her imprisonment, if any, has expired, until he work out his

fine and cost," is equivalent to saying that such person is not to be so confined therein for punishment or during his term of imprisonment, but *only after* his term has expired. This construction is too narrow, and leaves out of view the general scope and purpose of the law as indicated by the preceding and subsequent parts of the same section. What was the evil to be remedied? By §§ 5271 and 5272, and the Act of 1859–60 amending those sections, a person convicted of a misdemeanor whose term of imprisonment had expired could obtain his release, though he · had not paid the cost of his prosecution or the fine imposed, by taking an oath of insolvency. Now, the first section of this Act repeals the former legislation by which such misdemeanants had been enabled to avoid the payment of fine and costs, and in the same sentence enacts that he shall be confined in the county work-house " after the term of his or her imprisonment, if any, has expired until he work out his fine and costs." It is clear therefore that this language is not a prohibition upon confinement for punishment, but a prohibition upon any discharge, although the imprisonment has expired, " until he has worked out his fine and costs." The section giving power to confine for punishment in the work-house in lieu of the county jail, is not referred to in this section, or any other of the Act of 1875, and the subject of confinement for punishment is nowhere in the Act alluded to. The whole scope and purpose of the

Act was to prevent the release and discharge of misdemeanants until they had paid such fine and costs as had been imposed. This subject is the only one indicated by the title, and the provisions of the Act concerning the establishment and regulation of work-houses are germane to the subject indicated by the title.

It is next urged that this section is a provision found in the article of the Code of 1858 concerning "houses of correction," and that inasmuch as the Act of 1875 deals with the same subject by providing for such places of detention, and for the regulation of inmates, that therefore the later legislation operates to repeal by implication, not only the provisions of the old law concerning the establishment of such work-houses and their management, but also to repeal such parts of the old statute as defined the persons who should be subject to confinement therein, and that we must look alone to the later Act to see under what circumstances and for what purposes confinement may be imposed in such institutions. We have already seen that the new legislation does not, *in terms*, repeal any of the sections constituting the old article on work-houses. Neither does it profess to be a *revision* of the legislation on that or any other subject, and contains no clause repealing legislation in conflict.

The reasoning upon which repeals by implication is rested is well stated in the very late work of Mr. Sutherland on Statutory Construction, as fol-

lows: "An implied repeal results from some en-actment the terms and necessary operation of which cannot be harmonized with the terms and necessary effect of an earlier Act. In such case the later law prevails as the last expression of the legislative will; therefore the former law is con-structively repealed, since it cannot be supposed that the law-making power intends to enforce laws which are contradictions. The repugnancy being ascertained; the later Act or provision in date or position has full force, and displaces by repeal whatever in the precedent law is inconsistent with it." Sec. 138.

But by a very familiar and universal rule, re-peals by implication are not favored. The repug-nancy between two statutes must be very plain and incapable of reconciliation. *Frazier* v. *Railroad,* 88 Tenn., 140.

How far is the Act of 1875 repugnant to or inconsistent with the provisions of Article IV. of Chapter 7, relating to the safe-keeping of crim-inals? A comparison of the two Acts will dem-onstrate that the later Act does not cover or em-brace *all* of the provisions covered by the old law. The titles, to begin with, are by no means identical. Under the article in the Code several subjects are embraced which might well have been the subject of separate articles or Acts.

*First.*—The article empowers County Courts and municipal corporations to buy lands, and erect buildings thereon proper and necessary for a work-

house; and authority is given to appoint persons to manage such houses, and to make rules for the government of the inmates.

*Second.*—Punishment in excess of hard labor is expressly forbidden.

*Third.*—The article provides that when an inmate is confined for safe-keeping only, that his earnings should be paid over to him upon his discharge; but that if confined for punishment, his earnings should go to the county, unless he have wife or children, in which case one-half should be paid over to such wife or children.

Up to this point the legislation of the Act of 1875 may fairly be said to cover and embrace the legislation in this article. The article, in some particulars, was vague and defective in those provisions relating to the ascertainment of the inmate's earnings when he had a wife and children, and in not plainly prescribing who was to pay one-half of the earnings of such an inmate to his wife or children. This defect was, however, probably remedied by the provision authorizing County Courts to make regulations concerning the management of the inmates.

But the Code did not stop with providing for the establishment and regulation of such workhouses. It went much further, and defined the classes of persons who might be confined therein. These provisions were for the detention therein: (1) Of vagrants required to find sureties for good behavior; (2) of persons liable to confinement in

the county jail for safe-keeping only; (3) of persons liable to be confined in the county jail for punishment.

The Act of 1875 adds to these classes persons sentenced to pay fine and costs, such confinement to last until fine and costs had been worked out.

As to the confinement of the three classes subject by the Code article to detention in the workhouse, the Act of 1875 is silent. It did not therefore cover or embrace *all* of the provisions of the old law, and, under the well-settled rules of construction concerning repeals by implication, the provisions of the old Act not covered by the provisions of the later Act, are unaffected and still in force. Although there may be two Acts upon the same subject, yet the rule is to give' effect to both if possible. When, however, the later Act covers *all* of the provisions of the older Act, and embraces new provisions plainly showing that it was intended to substitute the new system or regulations for the older, then it will operate as a repeal of the former. This is the full extent of the doctrine as stated by Judge Field in the case of *United States* v. *Tyneu,* 11 Wall., 88. The rule as stated by Mr. Sutherland is: "When a new law covers the whole subject-matter of an old one, adds new offenses and prescribes different penalties for those enumerated in the old law, then such former law is repealed by implication." To this he adds that "the effect would probably be that of revision and repeal, though no new offenses

were added; it is enough that the new statute embraces all the provisions of previous statutes on the same subject which are intended to have force." Sutherland Stat. Con., Sec. 143.

The later Act does not cover all of the provisions of the older law, and the very important provisions of the old Act concerning the persons liable to confinement therein are still in force and unaffected by the new legislation. As an illustration of the conservatism of this Court in declaring repeals by implication, the case of *Cate* v. *The State* is in point. It also is an important instance of the survival of a part of an old Act, notwithstanding subsequent legislation upon the same subject largely affecting and changing parts of the old law. There a statute fixed a tax on the exercise of a certain privilege, and a penalty for exercising it without a license. A subsequent Act changed the tax and provided a summary remedy for its collection, but was silent as to the penalty. It was held that both Acts should stand together, in so far as the penalty was concerned, inasmuch as there was no necessary repugnancy between the Acts with reference to this feature. 3 Sneed, 120.

An effort has been made to narrow the scope of the Code article by arguments addressed to the constitutionality of the provisions concerning confinement at hard labor of persons held only for safe-keeping. This provision is certainly subject to grave objections; and when a case arises where one detained only for safe-keeping has been compelled

against his will to do hard labor, the matter will have that degree of consideration which the gravity of the constitutional question involved demands. It is enough to say that no such question is now before us. Neither can we assume that the Legislature of 1875 deemed it unnecessary to expressly repeal the provisions involving this question because of its supposed unconstitutionality. If those provisions were ever valid, they were unaffected by the Act of 1875. So the provisions concerning persons held for punishment, if ever valid, were not repealed by that Act. That this section was not repealed by the later Act was expressly held by a unanimous Court in the case of *Eaton* v. *State*, reported in 15 Lea, 200. The question was directly passed upon, and a work-house sentence approved and affirmed. The decision, we think, was sound, and the case ought to be followed.

The objection that this provision is obnoxious to the Constitution remains to be considered. The provision supposed to prevent such legislation is the eighth section of the Bill of Rights, providing that no one shall be "deprived of his life, liberty, or property, but by the judgment of his peers or the law of the land."

Where the conviction is for a misdemeanor, and the punishment is not prescribed by statute, the trial Judge may punish by a fine not exceeding fifty dollars, and imprisonment not exceeding one year, either or both in his discretion. This is well settled, and does not violate any constitutional

privilege. *Atchison* v. *State*, 13 Lea, 275; 7 Cold., 726.

Thus, a wide discretion is reposed in the Magistrate, and he is enabled to graduate punishment with some regard to the circumstances of the particular case. That this discretion as to the nature and duration of punishment may be committed to a Judge without violation of the constitutional proviso above quoted, is due to the fact that at the common law the kind and extent of punishment, in the absence of a statute prescribing the punishment, was left to the trial Judge. So the ancient statutes prescribing punishments very frequently fixed a limit and permitted the Judge, within such limit, to determine the punishment. In either case there is no violation of the right of trial by jury. The guilt of the defendant has been determined by a jury, and the law attaches to the verdict the punishment prescribed by the Judge if within the limits prescribed by law. Statutes prescribing imprisonment for felony not to exceed a certain number of years, and with or without hard labor, in the discretion of the Court, are by no means unusual, and we have been unable to find any authority questioning the validity of such statutes. It is not easy to understand why a Judge may, in his discretion, inflict imprisonment not exceeding one year, and yet may not be empowered to add labor as a part of the sentence. Hard labor is not an unusual or a cruel punishment. *Purvear* v. *Mass.*, 5 Wall., 475.

Statutes requiring a sentence of hard labor, or authorizing the requirement of labor as a means of discipline by the officers of institutions where persons are confined for punishment, have never been questioned. Teideman Pub. Pol., Sec. 35. That it may be imposed by a jury is not now challenged. But if, upon a verdict of guilty, the law attaches hard labor as a consequence of such imprisonment as the Court may lawfully impose, then hard labor becomes a part of the verdict, and is an incident. That it may or may not be imposed by the Court, in his discretion, cannot be any more objectionable than that he may or may not impose imprisonment.

Under an Act of Congress, a person convicted of a Federal offense may be imprisoned in any State penitentiary selected by the Court. By another Act, the convict so imprisoned in a State institution was subjected to the State authority, and to all the rules and regulations governing State convicts. Under an Act of Congress one Karstendick was convicted of an offense punishable by confinement in a penitentiary. He was ordered to be incarcerated in the penitentiary of West Virginia, where hard labor was required of all inmates as a rule of the institution. Upon a writ of *habeas corpus* the Supreme Court of the United States held that the trial Court might, in its discretion, have the sentence executed in a prison where such labor was required, although hard labor was no part of the judgment required by

law under the Act upon which he had been convicted.

With reference to this discretion resulting from the Acts of Congress allowing a Court to execute its sentence in any of many prison houses, the Chief Justice said: " Thus a wide range of punishment is given, and the Courts are left at liberty to graduate their sentences so as to meet the ever varying circumstances of the cases which come before them." *Ex parte* Karstendick, 93 U. S., 399. This doctrine was again approved *in re* Mills, 135 U. S., 266.

The Federal Constitution contains the same provisions with respect to the protection of life, liberty, and property, and in regard to right of trial by jury, as are contained in our own Constitution.

The imposition of labor as a means of discipline and a measure of health is neither cruel or unusual. It operates, when rightly regulated, as a mitigation rather than an aggravation of the punishment involved in imprisonment. It is not in itself disgraceful or degrading, but beneficial and humane. The misdemeanant may be disgraced and degraded by his punishment, but he cannot ascribe his degradation to his labor. To a certain degree it compels crime to support itself, and in many ways the power to require convicts to labor is a valuable addition to the forces of law and order. The fact that it may be imposed, in the discretion of the Court, operates to widen the power of graduating sentences to meet the merits of

particular cases. If a wider discretion were reposed in Criminal Judges, in regard to the kind and duration of punishment, it might not be the worse for society.

The writ of error and supersedeas must be dismissed, and a *procedendo* issued requiring execution of the sentence imposed.

## DISSENTING OPINION.

SNODGRASS, J. Durham was indicted in the Circuit Court of Sumner County at the June Term, 1886, for the murder of Joseph Brown. He was tried at the October Term, 1887, and found guilty of assault and battery.

Thereupon it was adjudged by the Court that he be confined in the county work-house at hard labor for three months, and pay a fine of fifty dollars, taxes and cost. He at once gave sureties for the fine and costs, including taxes, and judgment was accordingly rendered against them therefor, and execution awarded.

The defendant filed the record for error accompanied by petition alleging that the Chairman of the County Court had hired him out, and given the Sheriff an order to turn him over to the person hiring him, but the Sheriff refuses to do so, and keeps him confined in jail.

He avers that the judgment is in excess of the

authority of the Circuit Judge, and is void; that a work-house sentence can only be imposed for failure to pay or secure fine and cost, and that having secured these to the satisfaction of the Court, he cannot be sentenced to the work-house, and his confinement in jail under such sentence is unlawful.

Writ of error and supersedeas issued, and the case was heard on its merits at a former term, and during the absence of the Chief Justice, whose place was then filled by Thomas H. Malone, an explanation necessary to account for the participation of Judge Malone and non-participation of Judge Turney in this opinion.

On the hearing the Court divided in opinion, Judge Malone and the writer deeming the judgment without authority of law and void, and the majority holding it valid. Its importance required a written opinion, and the case was carried over for that purpose.

For the State it is insisted, and the majority so holds, that the judgment is authorized under the Code of 1858 providing for a house of correction. The sections of the Code treated as in force are brought forward in the editions of Thompson & Steger and Milliken & Vertrees. In the latter they are included as §§ 6256 to 6263 inclusive, and make up the whole of Article IV. of the Code. To fully understand them, and the views herein presented respecting them, it is necessary to quote in full. They are as follows:

47—5 p

"ARTICLE IV.

"HOUSE OF CORRECTION.

" 6256. The County Court of any county, and the authorities of any corporate town, may provide such lands, buildings, and articles of any kind as may be necessary for a work-house, or house of correction, for such county or town; and may appoint suitable persons for the management thereof, and make all necessary by-laws and regulations for the government of the inmates, and cause the same to be enforced.

" 6257. In no case shall the punishment inflicted in said work-house exceed hard labor.

" 6258. Any person who may be required to find sureties for his good behavior under the provisions of the chapter on vagrancy, may, for want of such sureties, be sent by the Magistrate before whom he is brought, to the work-house of the town or county in which the offense is committed.

" 6259. In all cases where a person is by law liable to be imprisoned in the county jail for safe-keeping or punishment, confinement in the work-house, if one be provided, may, in the discretion of the Court or Justice, be substituted.

" 6260. If he be confined for safe-keeping, his earnings, after paying for his board, shall be paid over to him on his discharge.

" 6261. If he be confined for failure to pay a fine and costs, he shall be detained until he shall pay the fine and costs by the proceeds of his labor,

and shall not be allowed to discharge himself by the act of insolvency.

" 6262. If he be committed for punishment also, the proceeds of his labor, during the term of his punishment, shall go to the county if he have no wife or children; but if he have, one-half thereof shall be paid to them.

" 6263. After the term for which he is imprisoned has expired, he shall be detained until the fine and costs are paid, as above provided."

If this is a valid law, and is not superseded or repealed by any other, it justifies the action of the Circuit Judge. The majority holds it is, for reasons assigned in their opinion, which are to be considered in connection with other views on the same subject to be hereinafter stated. I am of opinion it never was a valid law, for reasons absolutely conclusive to my mind, and which I think are suggested by the soundest constitutional principles. First, it will be observed that the "house of correction," with hard labor, was provided for all persons liable to imprisonment for safe-keeping or punishment, or because unable to give security for vagrancy; that it was provided as well for persons *committed* by the Magistrate as for those convicted and committed for punishment by any Court or for any offense.

By the terms of this Act, it includes all persons *imprisoned*, whether for safe-keeping, contempt, vagrancy, punishment for crime, or any detention authorized by law for which one is liable to be imprisoned.

Now, it cannot be insisted by any one (and the reservation of that question by the majority was unnecessary, because the Court could not be assumed to so believe) that the statute is valid so far as it imposes hard labor on persons merely held in custody and not convicted or adjudged by anybody to be guilty of any offense. That the man who is committed by a Magistrate and bound over to answer for a crime, or arrested on a capias and committed to jail to await the meeting of Court for trial, or committed because unable to give security as bail of vagrant, witness, or otherwise, can be put to hard labor because this Act says so, I do not understand anybody to assert, and feel sure the majority would regret to be understood as asserting; but if it were asserted by anybody, it would find no one to believe it, and so need not be argued. It is, then, a statute of no force whatever except as to commitments for punishment, embraced in about three lines only of the entire Act.

This elimination of all the Act save these lines is accomplished by striking out from it the provisions for working any imprisoned persons except those committed for *punishment*. As to those confined for failure to pay fine and costs, this Act is unquestionably superseded by the Act of 1875, which in express terms makes provision for the working of such prisoners in the "work-house" therein created and provided for.

If, then, we eliminate from the house of correction

statute all commitments by a Magistrate, or by the Courts merely for safe-keeping or legal detention, and it is superseded as to those committed for failure to pay fine and costs, the statute is alone held valid and in force for one of the many purposes for which it was passed.

Let us now look to the question in this view, and see what provision, if any, is made for working persons committed for punishment. Section 6262 provides that "if a person be committed for punishment, the proceeds of his labor, during the term of his imprisonment, shall go to the county if he have no wife or children, but if he have, one-half thereof shall be paid to them;" and § 6263 declares that "after the term for which he is imprisoned has expired, he shall be detained until the fine and costs are paid, as above provided." No provision was made for whom or how he should work, or at what rate he should be compensated, and therefore the Act was invalid, because such omission made it an impracticable system which could not be carried into operation.

In the work-house Act of 1875, as we shall presently see, this obvious defect, which made the law impossible of enforcement, was remedied so far as the latter Act undertook to provide for working out fine and costs, for it determines how the convicted defendant shall work, and what amount he shall be paid or allowed for his work as a credit on fine and costs.

The former Act, even as to one committed for

punishment, we repeat, made no provision as to the person who should work the prisoner, at what work, or at what wages. There is no provision for hiring him out, and neither State nor county is required to pay him, and yet in general terms it is provided that he shall work, and for a *compensation*, because the Act says that if he have a wife or children one-half the compensation for his labor shall go to them; if he have none, it shall all go to the county. Go from whom?

It was also provided that if the prisoner be confined for safe-keeping his earnings, after paying his board, shall be paid over to him. So that it is clear the Legislature had a general vague purpose that every prisoner was to work for and be paid by some one, but it neglected to provide for whom or at what compensation. Nor was this plain defect in the law, in consequence of which it was wholly inefficient and inoperative, cured by the general provision of § 6256 that the County Court might provide lands, buildings, and articles for a work-house or house of correction, and appoint suitable persons for the management thereof, and make all necessary by-laws and regulations for the government of the inmates, and cause the same to be enforced, because making by-laws "for the government of the inmates" has nothing to do with fixing their compensation, and no authority whatever is given to hire them to anybody who will pay for their labor.

Now, treating the Act as intending that the

prisoners should be worked for the counties—because the house and land and articles to be furnished in and on which they were to work were to be furnished by the counties, and the Act has no provision and authorizes none to be made whereby they could be hired out or worked elsewhere than in the property so furnished—the Court would not by construction extend the power given in such a clause "to make by-laws and regulations," to include the right to fix wages and hire out convicts at the unlimited discretion of every County Court, where one could fix one rate and another a different one, and the compensation of prisoners depend and the duration of their confinement depend on such uncertain, variable, and arbitrary discretion. Human rights and liberty have not again become cheap enough for that in this country.

Suppose such a construction was given the Act, what would have been the result while the provision was in force that a prisoner should be detained until fine and costs were paid, as provided in § 6263? In one county ten cents a day might have been fixed as compensation; in another 25, and 50, 75, or 100 cents in others. The detention would depend upon the different discretions of different County Courts, and be longer or shorter for the same fine and costs, as determined by the county in which the commitment was made. Such a result is the only one that follows a construction giving County Courts power to fix com-

pensation. It is inconsistent with reason and justice; and it has been expressly held to be inconsistent with the constitutional rights of an imprisoned defendant by our predecessors in a case arising under the work-house Act of 1875. That Act, in terms, provided that persons confined in the work-house for failure to pay fine and costs should not be discharged until the cost of all necessary clothing provided for them had been fully paid; and this Court, speaking through Judge McFarland, held that this provision was void, because it required imprisonment and labor continued to pay an indefinite and uncertain amount left to the discretion of the authorities furnishing the clothing, subject to great abuse, and to the objection that the imprisonment might be indefinitely prolonged; and was not the "law of the land" in the sense of the Constitution. *Knox* v. *State*, 9 Bax., 202.

This case strongly presents the view we are stating, and establishes the principle for which we contend. It seems to me, however, not to need support of authority, but to be obviously apparent that a law providing for such unascertained compensation or to pay for unvalued supplies is void; and yet the majority, if I gather its position clearly, from the rather cautious manner in which the point is dealt with, treats the law under consideration here as valid because, while fixing no rate of compensation, it is by construction left to the county authorities into whose hands

the prisoner falls when sent to the county work-house.

It, however, advances another view to sustain the law; and that is that if the defect suggested was a vital objection to it, the Act of 1875 now amends it and fixes the rate of compensation. But this assumes the whole question, and, without intending to do so, admits that the former law is void. It either assumes that the law could have been in existence as a valid law from the date of its passage to 1875, the date of amendment, although incapable of execution for want of the provision indicated, which cannot be true, or it admits that the law needed the amendment to be valid, and therefore has been always void. In either event the admission of the necessity of the provision destroys the proposition that the law was valid. Then, if it was not valid in itself, there was nothing to amend, and the Act of 1875 did not amend it. It will have been noticed, too, that the majority does not assume that the Act of 1875 intends or expressly makes this amendment. It is only assumed that there is a rate proper to be fixed *now* as compensation for persons imprisoned under the former Act for *punishment*, because the latter fixes a rate to be paid to one who is imprisoned to work out fine and costs. It is not held to amend the other in terms, and confessedly does not refer to the special omission of the former, but the amendment is assumed upon an analogy. Hence, we have a for-

mer law not only amended, but a void law vital-
ized by a subsequent one, which is applied on an
analogous principle.    We shall have more to say
of this provision hereinafter, but we respectfully
insist that the last law can have no such effect.
In this connection we submit an inquiry: Suppose
the wives or children of persons committed for
punishment before 1875 had sued for the one-half
due them, could they have recovered, and what?
Suppose they sue now for one-half the proceeds
of labor of such persons since 1875, will they be
entitled to recover twelve and one-half cents per
day of those who received the husband's and
father's labor? or, when such question arises, will
the disposition now made of it be declared non-
material and the position be abandoned, and the law
be held not to provide for such compensation?

In this connection we also call attention to the
fact that there has never been any compliance with
it or effort to enforce it in this or any other par-
ticular.    It was not only wrong in all its policy,
but was so vague and indefinite and incapable of
enforcement that it was from its inception a dead
letter, and has become obsolete.    No effort has been
made, so far as the records of this Court disclose
or the observation of the writer goes, until the
present, with one exception, to apply it.

It is referred to and recognized as valid by
our predecessors in the case of *Eaton* v. *State,* 15
Lea, 200.    But no question was made upon its
validity in that case, and it was merely treated as

valid because not questioned. This of course
happens in respect to many statutes, a notable
instance being that in which it was provided,
when this Court was composed of six members,
and equally divided in opinion as to affirmance or
reversal, the judgment of the Court below should
be affirmed. After this law had been acted upon,
and several judgments affirmed under it, and its
validity of course thus assumed, the question was
made that it was unconstitutional, and the Court
so held.

Many cases have occurred illustrating this posi-
tion, but this one is selected because it was one
vitally affecting the practice of this Court, and if
in such case it would overlook such a question, it
is clear that a case overlooking a more remote
constitutional question cannot be relied on as au-
thority affirmatively adjudging the constitutionality
of a law never brought directly in question.

'I feel sure that, had the question been made, the
learned author of that opinion would not have held
the law valid.

. Let us now inquire whether this law be valid
under the. Constitution, if it were neither vague
nor doubtful, and treating it as specifically provid-
ing for the working at hard labor of only persons
committed for punishment.

It is clear that the Legislature can make assault
and battery a crime, and it is not denied that the
Legislature could have made it punishable by im-
prisonment at hard labor. But it is not pretended

that it has done so. Assault and battery is, and was before the statute now being considered was passed, a misdemeanor at common law; and, as such, may have been punished by fine, or fine and imprisonment. One or both of these punishments may have been always in this State imposed by the Circuit Judge upon an offender found guilty by a jury. *Wickham* v. *State*, 7 Cold., 525.

This case states the law as it always existed in Tennessee. The question we are considering is a wholly different one. It is whether this common law offense, punishable by this common law punishment, can be, without express statute so providing, and upon the verdict of a jury so directing, converted by a Circuit Judge in a sentence, into a crime punishable by hard labor, and whether such sentence can be authorized under an Act providing that he may, in his discretion, so direct the punishment of all persons convicted of any offense punishable by imprisonment in the county jail. I deny that any such power to add hard labor to the imprisonment exists, and say that it cannot be exercised unless the punishment is expressly fixed by statute.

There is nothing in the cases cited by the majority from 5 Wall., 93, and 135 U. S., in antagonism to this position. On the contrary, they are in harmony with it. They were in construction of State statutes expressly authorizing it (a power conceded herein), and of Federal statutes expressly held to extend to it in equivalent terms. They

do not decide, as assumed, any question as to the punishment being or not being cruel and unusual, when inflicted by a Judge exercising the common law discretion.

Any imprisonment and any punishment authorized to be imposed by a Judge alone when our Constitution was adopted, is still authorized by that instrument. No other is permitted, because the Constitution declares that "cruel and unusual punishments shall not be inflicted." Art. I., §16.

At the time of the adoption of this Constitution, and of the others preceding, it was lawful for a Circuit Judge to impose imprisonment on a defendant convicted of assault and battery or other misdemeanor. 13 Lea, 276. It was not lawful when this provision was first adopted for him to impose hard labor as an additional punishment.

The eighth section of the same article added "that no man shall be taken or imprisoned, or disseized of his freehold liberties or privileges, or outlawed or exiled, or in any manner destroyed or deprived of his life, liberty, or property, but by the judgment of his peers or the law of the land."

The effect of these sections is to leave in the hands of the Circuit Judge the same power he then had to imprison, and no more than he originally had before their first adoption. He could not impose hard labor when they were adopted. He cannot do it now, because it is a cruel and unusual punishment by him.

In this connection it is proper to note the assumption of the majority that the labor imposed by sentence is not cruel, unusual, or degrading—that it is only imprisonment which degrades, while the labor exalts and benefits. It is true that labor *per se* is not only not degrading but highly honorable. The unconstrained labor of a free man is the highest exertion of right and duty, but the enforced labor of servitude is, for the same reason and by common consent, the most degrading act which can be compelled by law. Just as purity, which when unsullied is the loftiest virtue, evidences the lowest debasement when sullied. Once the imposition of labor to imprisonment was the distinguishing feature between the punishment of *offenses* and infamous *crimes*. By common consent of mankind imprisonment is not always degrading, but labor added is.

Again, the right to a man's labor is his property, and it cannot be taken from him under the eighth section quoted unless done by a jury. The Legislature could pass a law authorizing the jury to inflict hard labor as a part of the punishment for this offense, or probably make it discretionary, but no Act of the Legislature not expressly making hard labor the punishment will authorize a Circuit Judge to do so *in his discretion*.

It could command him to do it as the necessary result of a verdict, for then it would follow because of the verdict of a jury; but it cannot commit it to the discretion of the Judge, because he

alone then determines it. In doing so he takes
from the defendant the property which he has in
his labor, without the judgment of his peers or
the law of the land (in this connection meaning
the same thing—a fixed result universally appli-
cable), in addition to the infliction of a cruel and
unusual punishment.

So far we have been, in this connection, con-
sidering this statute as an existing one. We have
shown, we think, that it was originally invalid, be-
cause confessedly attempting to inflict a degrading
punishment on unconvicted and untried persons—
upon the innocent and guilty alike—and as being in-
capable of enforcement because of its vagueness and
inherent defects. Following this we have endeav-
ored to establish that the Act was unconstitutional,
because it authorized indefinite imprisonment; and
was not the law of the land; because it author-
ized the deprivation of the right of property in his
labor, which even an imprisoned man has, without
the judgment of his peers; and because it author-
ized the infliction of a cruel and unusual punish-
ment.

Now we propose to show that the Act is no
longer an existing statute, because it has been re-
pealed by the work-house Act of 1875. This Act
is Chapter 133 of that year, pages 117 to 121.
It originated a complete work-house system in
contradistinction to the "house of correction" leg-
islation of the Code, and provided, by specific and
elaborate details, for the establishment of work-

houses, management of them, working of prisoners, and the allowance of compensation to them, to be credited on the fine and costs adjudged against them. It provided for the working out of *costs* by persons convicted of misdemeanors. This was its object, as stated in the caption. The caption does not, in terms, include *fines.* It reads: "An Act to require persons convicted of misdemeanors to work out the *costs* of the conviction." The first section negatives the idea that the confinement of a defendant imprisoned for punishment merely should be in the work-house, because it declares "that hereafter every person convicted of a misdemeanor who fails to pay or satisfactorily secure the fine and costs adjudged against him or her, shall be sentenced to be confined, and shall be confined, in the county work-house, *after the term of his or her imprisonment, if any, has expired,* until he work out his fine and costs, including all jailer's fees accruing before and after conviction and down to final discharge."

This system, it must be noticed, does not embrace labor for unconvicted persons or the poor and unemployed who may be committed to jail. It does not embrace those committed by a Magistrate or a Judge without a trial, or for safe-keeping or mere detention, all of which defects in the other system are eliminated by common consent. It does include working out of fines and costs provided for in the "house of correction" statute, and the only thing of force in

Durham *v.* State.

that statute which it does not comprehend is the
working at hard labor of a person *committed to jail
for punishment.* This is not omitted by mistake,
because it specially refers to such class of prison-
ers, and provides for their confinement and labor
in the work-house only to secure fine and costs
*after their imprisonment in jail has expired.*

Is it conceivable that we have two systems still
in force in Tennessee—two work-house systems!—
one the house of correction system of the Code,
applicable alone to the imprisonment of a defend-
ant for punishment, who can be made to labor
under that law; and the other applicable to per-
sons who have failed to pay or secure costs and
fines?

It is not pretended that the Act of 1875 au-
thorizes imprisonment at hard labor for punish-
ment; it is not pretended that it justifies it; but it
is said that, although it is a system in itself, and
does not purport to amend the house of correction
law, but is legislation upon the same subject, and
so elaborate as to make a perfect system, free
from the various defects pointed out in the Act
establishing the other system, it is not a repeal
of the other law, because the working of a con-
victed defendant is not provided for, and hence
there is no necessary conflict.

This is predicated upon the principle that im-
plied repeals are not favored, and that one statute
will not be held to repeal another unless they are
plainly inconsistent; and the authorities cited by

48—5 P

the majority are only to this point. This law of construction is well recognized, but not properly applied. It is not the one applicable here, nor the only one applicable in construing repealing statutes. It is equally well settled that where *one system* is superseded by *another* the former is 're-pealed, though the latter omits provisions of the former which are not inconsistent with any provisions of the latter. And if a subsequent statute be not repugnant in all its provisions to a prior one, yet if the latter statute clearly intends to prescribe the only rule (or system), it repeals the former one. 17 Wall., 425; 3 Howard, 636; 97 U. S., 546; 107 U. S., 445.

A statute purporting (or intended) to cover an entire subject, repeals all former statutes on the same subject, either with or without a repealing clause, and notwithstanding it may omit material provisions of the earlier statutes. *Terrell* v. *State*, 86 Tenn., 523.

*A fortiori*, would the adoption of a perfect system remedying the defects of a former vague and uncertain one, and prescribing general rules for the operation of the latter, embracing all the legal provisions of the former, except one of doubtful construction, and that omitted by express exclusion, take the place of the former and repeal it?

It seems, however, superfluous to argue this question. The mere suggestion that we have two such parallel systems in Tennessee for different

classes of imprisoned persons, the first the house of correction system and the other the work-house system, it seems to me, is its refutation. But it is insisted that the work-house Act of 1875 amends the other, and leaves in force the right to imprison at hard labor for punishment. This can be conclusively shown to be untenable, because, in addition to the exclusion of such an imprisonment from the latter law, as shown in Section 1 of the Act of 1875, it appears that no provision is made for the compensation of such a convict, while the Code expressly directs that one-half his compensation, if a married man, be paid to his family. Paid by whom under the Act of 1875, and at what rate? No provision respecting payment of any such compensation is made. It is provided that a prisoner, working out fine and costs, shall be credited at the rate of twenty-five cents a day, but no compensation to be *paid* any one is fixed. Can we properly sit in a criminal case and say, as a Court of Equity, that the other ought to have the same, and that some undesignated party shall pay his family twelve and a half cents a day? We can say it if we will. There is no power to restrain us; but is it law, or is it justified by any rule of right or reason? Where does this Court, in the absence of express statute, get the power to take an equitable account in a criminal case and solemnly adjudge that it is intended by this statute—which does not say so, but instead says such a prisoner shall only be confined

in the work-house after his other imprisonment has expired — that such prisoner's wife or children shall be paid, and only paid twelve and a half cents a day? But if we do not hold that, what shall we hold? They are to be paid under the former statute, and by whom under either?

These considerations force the conclusion that this latter Act is not an amendment, but a repeal, and it is vain to avoid the force of them by saying that no question of compensation is now involved. It is not because such a question has arisen that it is referred to, but it is to show that the other Act—vague, defective, and incapable of enforcement—is not remedied by this.

But to illustrate still further, let us assume that the last Act is an amendment, what is the result? The work-house law of 1875 would have one additional section, reading thus: "Notwithstanding the provision of the first section of this Act that one committed to jail for punishment shall, after the expiration of such term, commence, in the work-house herein provided for, a term to work out fine and costs, nevertheless it is declared that such convict shall serve out such original term herein; and if he be a married man, one-half the proceeds of his labor in such term shall be paid to his wife and children, if he have wife or children, otherwise to the county."

This section would omit, it is again urged, the provision for amount and payor. It needs another section to perfect it. This we must add by judicial

Durham *v.* State.

construction to this effect, "And the Legislature having omitted to say who should pay such compensation, and what rate should be paid, and it appearing that on fine and cost a credit of twenty-five cents per day is allowed a prisoner working out such fine and cost, and that this goes to the county, therefore the prisoner held for punishment is entitled to that amount, and the county must pay his family twelve and one-half cents per day."

This might be equity, but as an account of human servitude so taken I shall never cease to regret that it can be law.

I conclude that the house of correction law was void on its face for vagueness, was unconstitutional when passed, disregarded in practice, obsolete by general consent, and repealed by the Act of 1875, and that the judgment directing the confinement of defendant in the work-house was void, and that he having secured the fine and cost, and thereby complied with all of the judgment which was valid, is entitled to be discharged.

Judge Malone concurs with me in this opinion.