PECK et al. v. ELLIOTT.

(Circuit Court of Appeals, Sixth Circuit. March 2, 1897.)

1. FEDERAL COURTS—JURISDICTION—POSSESSION OF RES—CITIZENSHIP.
    The fact that the circuit court has possession of all the assets of an insolvent corporation, for the purpose of winding up its affairs, in a suit pending in such court, gives it jurisdiction to entertain a petition, ancillary to such suit, against a debtor of the corporation, to ascertain and enforce payment of his debt, without regard to the citizenship of the parties or the amount in controversy.

2. CORPORATIONS—INCREASE OF CAPITAL.
    When the charter of a corporation or the general law under which it is incorporated does not impose any limitation upon the amount of capital which the incorporators may venture in the business, nor require the amount of the capital to be stated in the certificate of organization, but such corporation is given power to fix by by-laws the amount of capital, the rule that there can be no implied power to increase the capital of a corporation, fixed by the charter or articles of incorporation at a definite sum, has no application; and an increase of capital, by an amendment of the by-law fixing it, is valid, and a subscriber to such increase is bound.

3. SAME—REPEAL OF STATUTE.
    The provisions of section 5 of the Tennessee act of March 23, 1875 (Laws Tenn. 1875, c. 142), by which an increase of stock of a corporation is permitted by the action of the stockholders, were not repealed by the act of March 27, 1883 (Laws Tenn. 1883, c. 163).

4. SAME—TAX ON INCREASE OF STOCK—PRESUMPTIONS.
    When a statute requires the payment of a tax by a corporation upon increasing its capital stock, and makes its payment a condition precedent to the exercise of corporate powers, a court, in a suit involving the validity of such an increase of stock, will presume, in the absence of proof to the contrary, that the tax has been paid.

5. SAME—ACCEPTANCE OF INCREASED STOCK—ESTOPPEL.
    One who has accepted increased stock of a corporation, and has taken the office of president of such corporation by virtue alone of such stock, is estopped to question its validity, on the ground of the nonpayment of a tax required to be paid by the corporation on increasing its stock.

6. SAME—SUBSCRIPTIONS—ISSUE BELOW PAR—COLORABLE TRANSACTION.
    Where increased stock of a corporation is required by the terms of the authority for the increase to be sold at par, and the corporation buys from a subscriber to the increase a patent of no value to it, for the purpose of allowing the subscriber to get his stock below par by crediting the purchase price on his subscription, and afterwards resells the patent to him for a nominal sum, such transaction, being a mere evasion of the requirements of the issue of the stock, does not entitle the subscriber to any credit on his subscription.

Appeal from the Circuit Court of the United States for the Eastern District of Tennessee.

The Southern Malleable Iron Company is a manufacturing company, incorporated in August, 1890, under the general law of Tennessee. In November, 1893, H. H. Peck and Charles D. McGuffey were appointed receivers under a bill filed in the United States circuit court for the Southern division of the Eastern district of Tennessee, by the Northern Bank of Kentucky, a judgment creditor, with a levy upon certain assets. The object of the bill was to preserve the property as an operative unit plant, collect in its debts, complete certain valuable contracts, and sell the property as a whole, including its good will, for the satisfaction of all its debts according to priority of lien. The appellants under this bill were appointed receivers, and placed in possession of all its assets of every kind. During the course of the proceedings usual to such a creditors' bill, the receivers filed a petition, alleging the total inadequacy of the assets to pay debts, and setting out that the appellee, J. M. Elliott, a director and president of the corporation, was a subscriber to the capital stock of said company to the extent of 120½ shares of $100 each, and was indebted on that account in a balance due thereon of $6,997.32, and that the insolvency of the corporation rendered it necessary that this stock liability should be enforced. Leave of court was asked to file this petition in the principal case, and that J. M. Elliott be made a defendant thereto by proper process, and for a decree against him to the extent of his unpaid stock liability. An order was accordingly made by the Honorable D. M. Key, district judge, holding the circuit court, allowing the petition to be filed, and ordering that process should issue as prayed. It may not be out of place to say that, after the filing of the original bill, other bills were filed by creditors, including one for a foreclosure of a mortgage on the property of the company made to secure an issue of bonds. Subsequently all these bills were consolidated, and ordered to proceed under the name and style of "Ross-Meehan Brake Shoe Foundry Company v. Southern Malleable Iron Company et al." Elliott was duly made a defendant to the proceeding begun by the receivers, and filed his answer, denying the jurisdiction of the court; denying the jurisdiction to proceed against him by petition or bill in equity; and denying his liability as a stockholder. Proof was taken, and, upon a final hearing, the petition of the receivers was dismissed. 72 Fed. 957. From this decree, an appeal has been prosecuted, and errors assigned by the receivers.

Thomas McDermott, for appellants.

Geo. T. White, for appellee.

Before TAFT and LURTON, Circuit Judges, and SAGE, District Judge.

LURTON, Circuit Judge (after stating the facts as above). The jurisdiction of the court to entertain this petition of the receivers against the appellee depends upon its jurisdiction in the original case, to which this proceeding was wholly ancillary. This petition is auxiliary to the original suit. It is a petition by the receivers asking the aid of the court to enable them to collect in an asset of the corporation. It was filed by direction of the court under an order made in the principal cause. The jurisdiction of the court in the principal cause is not questioned, and cannot be in this collateral suit. Compton v. Railroad Co., 31 U. S. App. 486–529, 15 C. C. A. 397, and 68 Fed. 263; Mellen v. Iron Works, 131 U. S. 352–367, 9 Sup. Ct. 781; Lumley v. Railroad Co., 22 C. C. A. 60, 76 Fed. 66. The fact that the circuit court had possession of all the assets of the Southern Malleable Iron Company, for the purpose of winding up its affairs as an insolvent corporation, is the fact which made it admissible to bring a debtor of that corporation into the court, to the end that his debt might be ascertained and payment coerced. For the purpose of collecting in choses in action, the court might direct its receivers to

institute independent suits in that or courts of the state, or cause such debtors to be made defendants in the principal cause, and determine for itself any question which might be involved by the defenses to the claim. Such a proceeding would not involve any question of citizenship, or amount in controversy, nor mode of trial. The complete jurisdiction of the court over the res, the property and assets of this corporation, involved its right to bring before it persons having possession of any of those assets, or having claims thereon, or who were indebted to it, and either itself hear and determine all controversies, or refer them to a master or to a jury, as it saw fit. A court of equity is not deprived of jurisdiction simply because a purely legal question becomes collaterally involved. It might, in its discretion, submit such controversy upon issues made to a jury, or dispose of them without doing so. That the liability of appellee was one of a legal character did not operate to defeat the jurisdiction, and bring its proceedings against him to a stand. These questions seem conclusively settled by White v. Ewing, 159 U. S. 36, 15 Sup. Ct. 1018, a case which arose upon a like proceeding in the same court, and in which certain questions were certified by this court under the court of appeals statute.

We come, then, to the merits of the case. The defense to this stock liability is that the stock subscribed for by appellee was increase stock, and that there was no power in the corporation to increase its capital. In Tennessee, prior to 1870, all charters were granted by special legislation. Such charters, as in other states, usually defined definitely the amount of the capital stock of the company, or fixed a maximum beyond which it should not go. By article 11, § 8, of the Tennessee constitution, adopted in 1870, it is provided as follows:

"No corporation shall be created, or its powers increased or diminished, by special laws, but the general assembly shall provide by general laws for the organization of all corporations hereafter created."

The "general law" under which the Southern Malleable Iron Company was organized was approved March 23, 1875, and is chapter 142 of the Acts of Tennessee for 1875. That act prescribes a form of application to be followed whenever the corporation is one for the purposes of profit, and that the general powers of such corporatins shall be those prescribed by section 5 of the act. The act contains no requirement that the application for incorporation shall anywhere state the amount of the capital stock proposed to be invested in the business. Upon the contrary, the only provision in the act of 1875 touching the matter of capital stock is found in section 5, where it is said:

"The corporation may, by by-laws, make regulations concerning the subscription for, or transfer of stock; fix upon the amount of capital to be invested in the enterprise; the division of the same into shares; the time required for payment thereof by subscribers for stock; the amount to be called for at any one time."

Judge Clark, who heard this case in the court below, was of opinion that this power should be construed as authorizing the corporation "to fix only the original or initiatory stock of the company," and that this corporation, having, by a by-law, settled upon "the

amount of capital to be employed in the enterprise," was without power to subsequently increase this capital by an amendment of the by-law. He was further of opinion that the fact that Elliott, by virtue of this new stock, became a member of the corporation, a director, and its president, did not estop him from denying the validity of the new stock, although creditors of the corporation were dependent upon its collection for the satisfaction of claims presumably contracted upon the faith of the increased capital. This latter conclusion was grounded upon the proposition that, where the corporation is totally without power to increase its stock, the void act of increase cannot be adopted or ratified or the subscriber estopped in favor of creditors. Scovill v. Thayer, 105 U. S. 143. That changes in the amount of the capital stock do involve changes in organization, and in the relative relation of the original stockholders towards the corporation and each other, is very evident. That such changes cannot occur without the consent of the shareholders affected is also elementary. How such consent is to be given depends upon the organic law of the corporation. In the absence of some other binding provision in the constitution, that consent would have to be unanimous. But if the stockholder becomes such under a charter or statutory provision which subjects him, by the action of the directors or of a majority of the members of the corporation, to the liability of such change of relation growing out of an increase of stock, he cannot complain. He has so contracted. Cook, Stocks & S. § 280; Thomp. Corp. § 78; Payson v. Withers, 5 Biss. 276, Fed. Cas. No. 10,864; Payson v. Stoever, 2 Dill. 427, Fed. Cas. No. 10,863; Railroad Co. v. Gammon, 5 Sneed, 567; Read v. Gas Co., 9 Heisk. 545–553. In the case last cited, where a large increase in the capital stock had been authorized, after the defendant in error had become a subscriber, Judge McKinney, referring to the effect upon the relative rights of original subscribers, said:

"One of the terms of his subscription was that after organization the board of directors would have the power under the charter to increase the capital stock from time to time, not exceeding one million of dollars. But [said the judge] such increase of the capital stock could work no change in the rights or liabilities of the original subscribers, for the reason that the corporation continues to be the same entity, and for the further reason that it was part of the contract of the original subscribers that the directors should have the power to increase the capital stock."

Where the capital is fixed in the charter, whether the charter be by special act of legislation, or under a general organization statute, the limit so settled by the charter itself cannot be exceeded unless authority to make an increase be plainly conferred in the charter or by statute. Railway Co. v. Allerton, 18 Wall. 236; Thomp. Corp. §§ 2076–2079; Mor. Priv. Corp. § 454; Beach, Priv. Corp. § 468. The reason is plain. Where the amount of the capital stock is definitely fixed by the charter itself, a departure therefrom would be to alter the charter itself. The general rule that the powers of a corporation are those definitely granted and those necessarily implied from the character of the business it is authorized to carry on has application to any change of the authorized capital, and no authority to alter the capital thus defined will be implied. This is

the limit of the rule against the power to increase by implication, as laid down in the authorities cited above.

Mr. Morawetz, in his very carefully prepared text, states the principle thus:

"A corporation has no implied authority to alter the amount of its capital stock where the charter has definitely fixed the capital at a certain sum." Mor. Priv. Corp. § 434.

So Mr. Beach says:

"It is well settled that a corporation has no implied authority, either by resolution of the shareholders or by-law, to alter the amount of its capital stock where the charter has definitely fixed it at a certain sum." Beach, Priv. Corp. § 468.

The cases cited in support of the text of both of these authors are all cases where the amount of the capital was definitely fixed in the constitution of the company. The case before us is that of an incorporation under a general law which does not impose any limitation whatever upon the capital which incorporators may venture in their business. Neither does it require that the corporators shall in the constating instrument state what their capital is or is to be. No provision is made for any registration or other mode of publishing the amount of the capital of any company organized under this statute. The marked distinction between this and all other such acts to which attention has been called lies in the fact that, under this law, the amount of the capital of any company formed thereunder constitutes no part of the organic law, but is distinctly made a matter for corporate regulation, and relegated to the field covered by that branch of corporate law constituting the by-laws of the company. A by-law may regulate the exercise of a corporate power, but it cannot enlarge or alter the powers conferred by the charter or by statute. A by-law in its nature is subject to amendment, alteration, and repeal. It cannot destroy or impair a right, and must therefore be a reasonable exercise of the internal management of the corporation. Rights may vest in members or others under a by-law which cannot be divested by subsequent alteration. A by-law is a subordinate law. It must not conflict with law, constitutional, statutory, or common, and must not conflict with the constitution of the corporation as found in its charter. Subject to these qualifications, a by-law is distinguishable from the charter of the corporation in the fact that it is subject to alteration. These principles are primary, and need no support.

If a corporation is given power to determine upon its capital stock as a matter of internal regulation, it is difficult to see why one determination is the exhaustion of the power. Any matter which is the proper subject of regulation by by-law may be so regulated from time to time as the corporate interests demand. The right to alter such a regulation when once made may involve vested rights, and for that reason be inadmissible without consent of all affected. But the right to alter or amend a regulation which is the proper subject of corporate legislation through by-law must depend upon questions wholly foreign to those involved by the assumption of powers not expressly granted. Hence it is that the

rule invoked against an implied power of increase where the amount of the capital is definitely fixed by the charter or the statutory articles of incorporation has no application where the power to determine upon the capital to be engaged is made one of the matters for internal regulation by by-law.

But it is said that in Tennessee there was a well-settled, definite, public policy, which forbids the granting of an unlimited power of increasing the capital of such artificial creations. This public policy is supposed to be indicated by what is said in reference to old legislative charters, wherein it is said was always found a definite amount of capital. Whether this is so or not may be matter of dispute. But, assuming it to be so, we find by the nineteenth section of this act of 1875 a very marked departure from any former policy in respect to the increase of the capital of such old legislative charters. That section provides "that any corporation heretofore created by an act of the general assembly which may desire to change its name, increase its capital stock, or obtain any powers granted by this act, shall have the right to do so, by the board of directors of said corporation copying such amendment and making an application," etc. Then follows a form of application and a direction that, when the same has been acknowledged and probated and filed with the secretary of state in the manner provided for articles of original incorporation, the desired amendment shall become ipso facto a part of such old charter. The whole matter is set in motion by the directors, and no one may deny or question the granting of the powers thus applied for. By the subsequent act of 1883, being chapter 163 of the Acts of 1883, this same easy mode of increasing capital stock is extended to corporations theretofore created under a general law which gave to chancery courts the power to organize corporations. Now, whether section 19 of the act of 1875 and the act of 1883 be construed as working an increase of capital stock by the mere application of the directors, or as merely conferring a power of increase to be subsequently exercised by the members of the corporation to be affected, we shall not stop to consider. In one event the directors alone would be able to increase the stock of any such company to any extent they saw fit. Upon the other construction the applying corporation, acting alone through its directors, would obtain for their corporation an unlimited right of increasing capital stock, whenever the members chose to exercise it. It is thus very evident that, when this act was passed, there was no definite legislative policy prohibiting the granting of a right to increase the capital of such companies, to be exercised at the will of the corporation concerned. The liberality of the legislature in this respect towards these old legislative irrepealable charters would not lead us to expect any less liberality towards the new brood of corporations anticipated under the legislation then in hand, especially as the same act reserved the right to repeal, alter, or amend the law under which they were to organize. Neither does the power to increase imply or involve the power of decrease. Very different questions of public policy are involved by a power of diminishing capital invested in such companies. The rights of creditors would be affected by a decrease. Their rights are not injuriously involved by an increase.

To decrease the capital of such a company would be, in most cases, to withdraw capital pledged to the fortunes of the adventure. These reasons have led the courts with great unanimity to hold that the power of increasing the capital does not involve or imply the power to decrease. Sutherland v. Olcott, 95 N. Y. 94; Moses v. Bank, 1 Lea, 398–408; Salt Co. v. Curzon, L. R. 3 Exch. 35–42; Seignouret v. Insurance Co., 24 Fed. 332; Spell. Priv. Corp. § 770; Smith v. Goldsworthy, 4 Adol. & E. (N. S.) 430; Cook, Stocks & S. § 281; Mor. Priv. Corp. § 434. That an increase in the capital stock goes to the very foundation of the organization, and changes the relation between original subscribers and the corporation, must be admitted. It furnishes a consideration which might move the legislative authority to withhold or regulate the power. But in the last analysis this is a matter which affects members alone. If they become such, subject to such changes, they cannot complain. No question of public policy is involved by this consideration. Under this act, the power of increase is vested in the whole corporation to be exercised by the shareholders. Under such a power, the directors alone cannot authorize an increase. Railway Co. v. Allerton, 18 Wall. 233; Eidman v. Bowman, 58 Ill. 444; Brice, Ultra Vires (3d Eng. Ed.) 280.

These considerations lead us to the conclusion that where, by the constitution of a corporation, it is given power to fix upon the amount of capital stock to be engaged in the business by by-laws, an increase of capital by an amendment of the by-law is valid, and a subscriber bound. The case is like that of a corporation whose capital, by charter provision, is limited by a maximum named therein. In such a case an increase is valid, provided it does not exceed the charter limit. Brice, Ultra Vires (3d Eng. Ed.) 280; Gray v. Bank, 3 Mass. 364; Railroad Co. v. Cushing, 45 Me. 524–532; Cook, Stocks & S. § 281. This question has not been decided by the supreme court of Tennessee. The question was mooted in Cartwright v. Dickinson, 88 Tenn. 476–487, 12 S. W. 1030, but expressly reserved.

The case of Insurance Co. v. Kamper, 73 Ala. 325, has been much relied upon by appellee. It is not in point. The Alabama law required that the constating instrument should state the amount of capital proposed to be employed. This became a definite sum stated in the charter. The fact that the application also stated that the sum named was subject to increase was a nullity. It was an unauthorized power injected into the application. The Tennessee statute contains, as we have already stated, no requirement that the application shall fix the amount of the capital.

This brings us to the Tennessee act of March 27, 1883, being chapter 163 of the Acts of 1883. That act is as follows:

"That any persons organized as a corporation under a charter granted by a chancery court of this state, or under the Acts of 1875, chapter 142, approved March 25, 1875, who may desire to, to change the name of such corporation, increase its capital stock, or obtain any power granted by the act entitled 'An act to provide for the organization of corporations,' approved March 23, 1875, shall have the right to do so under and in the manner provided by section 13 of said act, which provides for the amendment of charters granted by the legislature, and with the like effect as therein provided: provided, that this act shall in no way apply to or affect corporations where suits have already

been brought to declare their charters void, and shall have no effect on any kind of litigation or suits now pending against such corporation, for any purpose."

This it is urged is a repeal by implication of the provision in the act of 1875 which we construe as permitting an increase of stock through corporate action of stockholders. This act deals with two distinct classes of corporations,—those organized under the act of Jan. 30, 1871, authorizing chancery courts to organize corporations with the powers conferred by the act, and those organized under the act of 1875. The language of the act is general, but it is manifest that some of the subjects with which it deals relate to but one of the two classes of corporations, while others are common to both. Thus, it is provided that persons organized under either of the two general laws referred to, "who may desire to," may have three distinct privileges. First, they may change the name of the corporation. Second, they may increase the capital stock of the corporation, or obtain the power to increase the capital stock, as these words may be construed. Third, they may obtain the powers granted by the act of 1875. The words of the act in furtherance of the intention must be taken distributively, "redendo singula singulis." They should be applied to the subject-matter to which they relate, as indicated by the context. Suth. St. Const. § 282. "Persons organized as a corporation under" the act of 1875 cannot possibly wish to obtain the powers with which they are already vested. This provision must therefore be referred to corporations not organized under the act of 1875. This principle of construction, being clearly applicable to this act, may be properly applied to so much of the act as refers to the subject of an increase of capital stock. If this act be construed as one by which the power to increase capital stock is to be obtained by such an amendment, to be exercised by the members of the corporation, then that power already existed, and these words should be referred to the other class of corporations where the power did not exist. The power to change the corporate name did not exist under either class of articles of association. This part of the act may therefore be regarded as applicable to both classes of corporations.

The act of 1883 contains no repealing clause, and the argument for repeal of the power of increase by by-law, which we find in the fifth section of the act of 1875, has no basis, if the rule of construction we have applied be sound. But if the maxim, "Redendo singula singulis," has no proper application, and all the provisions of the act be held as intended to apply to corporations organized under the act of 1875, then there is no room for an implied repeal of that power, if the act of 1883 be construed as conferring on the directors the power to increase the capital by simply making the application prescribed. Such a power of increase by action of the directors would not be necessarily inconsistent with the power of increasing by action of the shareholders through by-law. The whole subject would not be covered by the new act. Repeals by implication are not favored, and will not be presumed if the two acts can stand together. Repugnancy in principle merely is not enough to work a

79 F.—2

repeal, unless it is clear that the new legislation is intended to cover the whole field. Suth. St. Const. § 137; Cate v. State, 3 Sneed, 120; Durham v. State, 89 Tenn. 723 et seq., 18 S. W. 74. On the other hand, if the act be construed as a method by which corporations not having the power of increasing capital may obtain the power, then the inclusion of corporations organized under the act of 1875, among those intended as beneficiaries, would not repeal a power already existing, there being no difference in limitation or method between the existing power and that to be obtained by applying for the amendment. So far as that act may be regarded as a legislative opinion that the power of increase did not exist under the act of 1875, such opinion, though entitled to some consideration, would not be of any considerable weight, and is offset by a contrary opinion evidenced by the repeal of the act by the act of April 7, 1893 (Acts Tenn. 1893, p. 299), and the substitution of no other mode of increasing capital. This express repeal would leave no mode by which such companies might lawfully increase their capital stock, unless the power existed under the act of 1875,—a condition of things which we cannot assume the legislature to deliberately intend in view of the legislative history of this subject.

Another objection to a decree against appellee remains to be considered. The eighth section of the revenue act of 1891 provided, among other things, that every corporation increasing its capital should pay a certain privilege tax upon the increase; "and no such corporation, joint-stock company, or association shall have or exercise any corporate powers until the said tax shall have been paid. And the secretary of state shall not file or record any charter, certificate of incorporation, or articles of association, or certify or give any certificate to any corporation, joint-stock company, or association until the foregoing tax has been paid; and no such company, incorporated by any special act of the legislature, shall go into operation, or exercise any corporate powers or privileges, until said tax has been paid." There are several answers to this:

First. It does not appear that this tax has not been paid. The court will not presume that this tax law has been violated, but will, on the contrary, presume that the law has been complied with. Young v. Iron Co., 85 Tenn. 189, 2 S. W. 202.

Second. This defense is not open to appellee. If the corporation had the power to increase its stock, the failure to pay this tax is a mere irregularity, against which the appellee, by his acceptance of the stock and his taking the office of president by virtue alone of his stock, has estopped himself. The case in this aspect falls under the cases of Handley v. Stutz, 139 U. S. 417, 11 Sup. Ct. 530, and Veeder v. Mudgett, 95 N. Y. 295. That this increase was made by a resolution of the stockholders clearly appears. A by-law is nothing more nor less than a resolution of the members of the incorporation. This resolution was unanimously passed. Elliott claimed a credit for $3,012.50, for a patent right assigned to the company in part payment on his stock. This arrangement was made as a means of letting Elliott have the stock at less than par, its capital having been impaired by losses, so that its actual value

was less than 75 per cent. of its par value. The difficulty to be met was not that increase stock might not in good faith be sold at less than par, but in the fact that the by-law authorizing the increase required the new stock to be sold at par. Elliott made the transfer of this patent right July 6, 1892, and on January 31, 1893, the directors passed a resolution in the following words:

"Resolved, that, for and in consideration of the sum of $1.00, the right transferred to this company by J. M. Elliott, Jr., for the manufacture of his vertical hook coupler, be, and is hereby, transferred back to him. All rights by this transfer are released and conveyed back to him, the same as though said transfer made on the 6th day of July, 1892, had not been made."

The arrangement by which this patent right was to be taken at the price fixed was for the purpose of evading the condition prescribed by the shareholders, namely, that the increase stock should be sold at par. This seems to have been known to Elliott. The resolution by which he reacquired the patent, at the nominal sum of one dollar, must be construed either as a rescission of the agreement for the purchase of his patent, or as but a part of the original illegal scheme by which the limitation upon the power of the directors to sell the new stock at less than par was to be evaded. In either event, the appellee is not entitled to the credit, it not appearing that the patent was of any value to the corporation while it held the title. The subsequent agreement of the receivers to allow this credit was a mere proposed compromise settlement, and never carried out, appellee refusing to pay the balance due upon obtaining such credit or to give his notes therefor.

The decree must be reversed and remanded, with direction to enter a decree against appellee for $6,997.32, with interest from the filing of the petition of the receivers. Appellee will pay the costs of this court and costs under the petition in the court below.