Woods v. State.

## Woods *v.* State.

### (*Jackson.* April Term, 1914.)

1. **STATUTES. Validity. Plurality of subjects.**
Indeterminate sentence law (Acts 1913, ch. 8) is not violative of
Const., art. 2, sec. 17, as containing plurality of subjects. (*Post,
pp.* 104-106.)

Constitution cited and construed: Art. 2, secs. 1, 3.

2. **JURY. Trial by jury. Right. Assessment of punishment.**
Since the right to trial by jury at common law did not extend
to assessment of punishment, the indeterminate sentence law
(Acts 1913, ch. 8) was not unconstitutional as impairing the
right of trial by jury. (*Post, pp.* 106, 107.)

Cases cited and approved: Durham v. State, 89 Tenn., 723, 733;
George v. People, 167 Ill., 447; People ex rel., Bradley v. Ill. St.
Reformatory, 148 Ill., 413; Skelton v. State, 149 Ind., 641; Miller
v. State, 149 Ind., 607.

3. **JURY. Criminal prosecutions. Assessment of punishment.**
It is not essential that the punishment to be imposed on a person
convicted of an offense be assessed by the jury, unless the
statutes of the state so direct, since the power to declare what
shall be the appropriate punishment for an ascertained crime
is a matter solely of legislative cognizance, which body may
provide a minimum and a maximum punishment, and leave
it to the jury to fix a definite term within those limits, or it
may provide a single term, leaving nothing for the jury, except
to respond to the issue of guilty or not guilty. (*Post, pp.*
106, 107.)

4. **CONSTITUTIONAL LAW. Due process of law. Indeterminate
sentence law.**
Indeterminate sentence law (Acts 1913, ch. 8) is not unconstitu-
tional as depriving a person convicted of an offense, and sen-

tenced thereunder, of his liberty without due process of law. (*Post, pp.* 107, 108.)

Constitution cited and construed:   Art. 1, sec. 8.

5. **CONSTITUTIONAL LAW**   Departments of government.   Infringement of judiciary.   Indeterminate sentence law.

Since the powers conferred on the board of prison commissioners by the indeterminate sentence law (Acts 1913, ch. 8), though involving the exercise of judgment and discretion, are administrative only, the law is not unconstitutional as vesting in the board judicial power.   (*Post, pp.* 108-111.)

Cases cited and approved:   State v. Page, 60 Kan., 664; State ex rel. v. Peters, 43 Ohio St., 629; People ex rel. v. State Reformatory, 148 Ill., 413; Geo. v. People, 167 Ill., 447; Miller v. State, 149 Ind., 607.

6. **PARDON.**   Parole.   Indeterminate sentences.

Indeterminate sentence law (Acts 1913, c. 8), conferring on the board of prison commissioners power to grant paroles to prisoners after having served the minimum term specified for an offense of which they have been convicted, does not confer unlimited discretion on the board, but authorizes the granting of such parole only in accordance with the conditions specified by section 4 for final discharge, to wit, the board must believe, from the history of the prisoner and his conduct during the service of the minimum term, etc., that he will probably not violate the law, and that his parole will not be incompatible with the interests of society.   (*Post, pp.* 111, 112.)

7. **CONSTITUTIONAL LAW.**   Departments of government.   Interference with legislature.

Indeterminate sentence law (Acts 1913, ch. 8), conferring on the board of prison commissioners power to grant parole of prisoners who have served the minimum term of punishment, is not unconstitutional as vesting legislative power on the board; the parole being but a qualified enlargement of the prisoner, who is subject to be returned to actual confinement at any

. Woods v. State.

moment on the determination of the commissioners that he has broken his parole. (*Post, pp.* 112-114.)

Acts cited and construed: Acts 1897, ch. 125, sec. 24; Acts 1903, ch. 343; Acts 1913, ch. 8.

Case cited and approved: State v. McClellan, 87 Tenn., 52, 56, 58.

Cases cited and distinguished: State ex rel. v. Evans, 122 Tenn., 184, 191, 192; Richardson v. Young, 122 Tenn., 471, 490-502.

8. **PARDON.** **Authority to pardon.** **Indeterminate sentence law.**

Since the discharge of the prisoner under indeterminate sentence law (Acts 1913, ch. 8) by the board of prison commissioners is not a pardon, and the disabilities of the crime in respect of the rights of citizenship, etc., remain until removed by proceedings for that purpose, the law was not unconstitutional as interfering with the governor's pardoning power, which exists and may be exercised independent of such law. (*Post, pp.* 114-119.)

Case cited and distinguished: Fite v. State, 114 Tenn., 646.

Acts cited and construed: Acts 1869-70 and 1885, sec. 18; Acts 1891, ch. 123, sec. 18.

---

### FROM MADISON.

---

Appeal from Criminal Branch of Circuit Court, Madison County.—N. R. BARHAM, Judge.

HERON PEARSON, for appellant.

W. W. FAW, Assistant Attorney-General, for the State.

Woods v. State.

Mr. CHIEF JUSTICE NEIL delivered the opinion of the Court.

The plaintiff in error was found guilty of the crime of housebreaking with intent to commit larceny, and the jury in their verdict fixed the term of imprisonment at five years in the State penitentiary, pursuant to the practice anterior to the passage of the indeterminate sentence law, chapter 8 of the Acts of 1913. The trial judge, disregarding so much of the verdict as assessed the period of imprisonment, fixed the term under the law just referred to at not less than three nor more than ten years, the minimum and the maximum of our statute for the crime for which plaintiff was found guilty. The crime was committed after the passage of the act of 1913.

The plaintiff in error has appealed, and assigns the action of the trial judge for error.

The ground of the assignment is that the act of 1913 is unconstitutional.

The main points of attack are that the act deprives the prisoner of his constitutional right of trial by jury; it deprives him of his liberty without due process of law, in violation of section 8 of article 1 of our State Constitution; it confers judicial powers upon certain administrative officers, the prison commissioners, in violation of those provisions of our constitution which distribute the powers of government into three departments, legislative, judicial and executive, and forbids each to encroach on the domain of the others;

it delegates legislative powers to the commissioners, in violation of the same provisions; it invades the pardoning power, bestowing on the board of prison commissioners authority which, under the Constitution, belongs only to the governor.

There is another objection, to the effect that the act contains two subjects, in violation of section 17 of article 2 of the Constitution. This point, however, is so clearly without foundation that we shall not discuss it, and we mention it only for the purpose of putting the subject at rest.

In order to a proper determination of the other objections it is necessary that we state the chief provisions of the act, omitting matters which are merely subsidiary.

By section 1 it is enacted that, whenever any person over eighteen years of age shall be convicted of any crime punishable by imprisonment in the penitentiary, the court shall sentence that person to confinement in the penitentiary for an indefinite period, not less than the minimum nor more than the maximum term provided by law for the crime, subject, however, to an allowance for good time as now provided by law.

Under section 3 the members of the board of prison commissioners are constituted a board of parole, clothed with power to cause to be released on parole any prisoner sentenced pursuant to section 1, when he has served the minimum term, less good time.

It is further provided that prisoners while on parole shall remain in the lawful custody of the board of pa-

role, subject at any time to be returned to the penitentiary upon a violation of the terms of the parole, and that a written order of the board, certified by any member, shall be sufficient warrant to retake any such prisoner and return him to actual custody.

The instrument of parole must fix geographical limits as bounds for the convict, and these must lie wholly within the State, and they may be enlarged or reduced according to the conduct of the prisoner.

The board is given authority by and with the consent of the governor to employ a suitable person as parole officer, also styled secretary, and through this officer its members are to keep in communication as far as possible with all prisoners on parole and with their employers. In addition, the prisoners are required to report to the board through this officer at such times and in such manner as the board may prescribe.

When such person on parole has kept the conditions thereof, in such manner and for such a period of time as shall satisfy the board that he is reliable and trustworthy, and that he will probably remain at liberty without violating the law, and that his release is not incompatible with the welfare of society, then said board may recommend to the governor that he grant to such prisoner a final discharge from confinement under such sentence, and upon the granting of such discharge by the governor it becomes the duty of the board to issue to the prisoner a certificate of such final discharge, and also to cause a record of the acts of said prisoner to be made, showing the date of his com-

mitment, his record while in prison, the date of his
parole, his record while on parole, and other reasons
for his final discharge, together with any other facts
which said board may deem proper; and a copy of
such record, certified to by the secretary, it is declared,
shall be admissible as evidence in any proceeding in
which such prisoner seeks restoration to the rights
and privileges of citizenship.

The act does not impair the right of trial by jury.
Under our constitution the right of trial by jury must
be preserved inviolate. This means that it must be
preserved as it existed at common law. The essentials
of this right are that there shall be selected, in the
presence of the trial judge, by the parties, under pro-
visions giving each a fair opportunity for the selec-
tion, a jury of twelve good and lawful men; that they
shall be duly sworn; that to them shall be submitted
the issues between the parties, on the competent ma-
terial evidence offered by the respective parties; that
the trial judge shall preside, and pass upon the com-
petency of evidence offered; that the jury shall be
charged by the trial judge touching the principles
of law applicable to the issues; that the jury, after hav-
ing thus heard the evidence and received the charge
of the judge, and considered them in relation to each
other, shall render a unanimous verdict upon the is-
sues; and that, if correct in form, it shall be received
by the trial judge. It is not essential that the jury
assess the punishment, unless the statutes of the State
so direct. The power to declare what shall be the ap-

propriate punishment for an ascertained crime belongs solely to the legislature. That body may provide a minimum and a maximum, and leave it to the discretion of the jury to fix a definite term within these limits; or it may provide a single term, as is sometimes done, leaving nothing for the jury, except to respond to the issue of guilty or not guilty. The right to have the jury assess the punishment was not a part of the right of trial by jury at common law. *Durham* v. *State,* 89 Tenn., 723, 733, 18 S. W., 74; *George* v. *People,* 167 Ill., 447, 47 N. E., 741; *People, ex rel. Bradley,* v. *Ill. St. Reformatory,* 148 Ill., 413, 36 N. E., 76, 23 L. R. A., 139; *Skelton* v. *State,* 149 Ind., 641, 49 N. E., 901; *Miller* v. *State,* 149 Ind., 607, 49 N. E., 894, 40 L. R. A., 109.

We are unable to see how the constitutional provision concerning due process of law has been violated. That provision is:

"That no man shall be taken or imprisoned, or disseised of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty, or property, but by the judgment of his peers or the law of the land."

The statute in question is the law of the land, because it is a public, general law, applying to a definite and reasonable class of cases, that is to say, all felonies committed by persons over eighteen years of age, and bears equally upon all persons of the class described who shall commit such crimes subsequent to its passage. The language that he shall not be "de-

prived of his liberty, . . . but by the judgment of
his peers,'' does not mean that the jury shall fix the
punishment, but merely that in cases to which jury
trials are applicable the prisoner shall not be deprived
of his liberty but by the judgment of a jury finding
his guilt. Upon such guilt being found by the verdict
of a jury duly returned into court and accepted by the
trial judge, the law at once attaches to it the penalty
prescribed therefor, and it is the duty of the judge to
pronounce such sentence.

It is therefore true in a very real sense that by such
verdict he is deprived of his liberty. The result is
not different from what occurred under the former
practice, under which the verdict ascertained a defi-
nite period of service. That could not become opera-
tive until sentence was pronounced by the judge, but
it was the duty of the judge to pronounce sentence
if he permitted the verdict to stand. The only distinc-
tion under the present statute is in the extent of the
imprisonment, or deprivation of liberty. The sentence,
though indeterminate, not less than the minimum nor
more than the maximum, is in effect for the maximum,
subject to reduction in the manner stated, after the
minimum time shall have been served.

The powers conferred on the board of prison com-
missioners are not judicial in their nature, but only
administrative. They require the exercise of judg-
ment and discretion, it is true; but it is essential that
such powers be vested in administrative officers, to a
limited extent, at least, otherwise they cannot discharge

any of their duties.   Each time such an officer acts,
he. must determine whether the special thing to be
done falls within the line of the powers conferred upon
him by law.   This involves a comparison of the terms
of the statute, and the nature of the matter offered as
a duty, and a judgment or decision whether the lat-
ter falls within the former.   The clerk of a court is
required to issue an attachment on the filing of an
affidavit, or of a bill properly verified, and the execu-
tion of such a bond as the law demands.   Of the suffi-
ciency of the affidavit and bond he must judge before he
acts.   A sheriff is asked to levy on certain property
as that of the execution debtor.   He must decide wheth-
er the property is subject to levy.   If the property is
claimed by another, he has the right to require an in-
demnity bond, but must judge of its sufficiency, both
as to its terms and the solvency of the sureties offered.
So, when bail is offered for a prisoner in his custody,
he must decide whether the case is one in which the
law permits him to take bail, and if it be such he must
take the bond in the amount prescribed by the court,
magistrate, or officer having power to admit to bail,
and he must judge of the solvency of the bond.   A no-
tary public or a clerk of the county court is required
to take the acknowledgment of a married woman to
her conveyance of her real estate when the deed is
joint, made by her with her husband; but before doing
so he must examine her separately and apart from her
husband touching her free and voluntary execution of
the deed, and before certifying the fact must determine

that she is making the deed freely, voluntarily, and understandingly, without compulsion or constraint on the part of her husband. A tax assessor must inquire into the nature and character of the property, and upon the facts so brought before his mind must determine its value, and the amount for which it shall be assessed.

A recorder of deeds must decide whether the instrument offered has attached to it the legal form of acknowledgment, imposing on him the duty of recording it on the record books of his office. The trustee of a county, before paying a warrant drawn on the treasury, must first determine whether it is signed by the proper officer and in due legal form. The district attorney-general for the State must decide whether a state of facts presented to him by one desiring to prosecute another will legally justify him in preparing an indictment thereon and sending it to the grand jury. An officer in whom is reposed the duty of issuing and revoking licenses, either or both, must decide whether the facts presented require his action either way. A health officer must decide whether the facts show the existence of a nuisance, requiring him to act. The same is true in case of threatened epidemics, requiring the imposition of quarantine regulations, and the like. In all of these instances—and many more might be given—the exercise of judgment is required, and in the three last mentioned a wide discretion. Yet it cannot be asserted that such acts or decisions are judicial in their nature. The important element of a litis or liti-

gation is wanting—an issue between parties brought before a court for determination, or some matter in contestation between parties.  In addition, the act does not purport to confer power whereby anyone may be deprived of any legal right, or whereby property or any right claimed can be taken from one person and delivered to or devolved on another. *State* v. *Page,* 60 Kan., 664, 57 Pac., 514; *State, ex rel.,* v. *Peters,* 43 Ohio St., 629, 4 N. E., 81; *People, ex rel.,* v. *State Reformatory,* supra; *George* v. *People,* supra; *Miller* v. *State,* supra.

As to the extent of the discretion conferred, the act imposes upon the exercise of the power of the board of prison commissioners to grant a parole the condition that such power shall not be exercised until the prisoner has served the minimum of punishment fixed by law for the crime committed.  When this has been accomplished, the discretion to grant the parole arises. On first blush, the discretion seems then unlimited; but it was without doubt in the mind of the legislature that the same principles should control which were laid down in section 4 as conditions for final discharge. That is to say, the board must believe, from the history of the prisoner and his conduct during his service of the minimum term, that during his qualified liberty under the parole he will probably not violate the law, and generally that his release on parole will not be incompatible with the interests of society.

Again, as a basis for the exercise of discretion and its enforcement, it is to be noted that the prisoner

while on parole is in the legal custody of the board; that this custody is of the same nature as that which the sureties on a bail bond have of a prisoner released on such bond, only more stringent; and the board has power to fix, in the written instrument of parole, the geographical limits of the prisoner's freedom. Moreover, the law requires that its members shall as far as possible keep in actual communication with the prisoner, and that he shall continually report to them. The security of the State's control over the prisoner during the term of his parole is guaranteed by the power conferred on the board to cause his arrest at any time on its written order, certified by any member thereof. The statute provides that this written order shall be sufficient warrant to any officer to retake and return to actual custody any such convict. Such order would, of course, run in the name of the State, as the constitution requires of all process, and should be addressed "to any lawful officer."

The powers conferred are in no sense a delegation of legislative authority. The act does not attempt to confer on the board the power to fix the punishment that any given crime shall bear. The act itself, in effect, becomes a part of every judgment, and the board only one of a series of agencies for the execution of the judgment. The legislature declared by previous statutes that the period of confinement, aside from certain crimes not pertinent here, should lie between a maximum and a minimum; the ascertainment of the exact period between the two being left for the jury

in each case.   Under the present statute the punishment is fixed at a maximum, subject to diminution below that number of years, after the minimum shall have been served, through the operation of a certain discretion vested in the board of prison commissioners.   But until final discharge the diminution referred to is only a qualified one, since the prisoner is only out on his own recognizance, so to speak, subject to be returned into actual physical confinement at any moment.   It is impossible to see any element of legislation in the power so to be exercised by the commissioners.   There is a striking similarity between the powers here conferred on the board and the authority granted to prison officials under good time statutes, which have generally been held constitutional.   It is true the legislature of our State fixes the terms on which the prisoner is entitled to good time, and how much good time shall be allowed each year (Acts of 1897, ch. 125, sec. 24), and it has been held to be a right which cannot be denied him; but still there may be a deduction from good time earned for subsequent bad conduct, and there is a discretion in the officers, depending on their judgment as to whether he has obeyed the rules of the prison.   Acts of 1903, ch. 343; *State v. McClellan,* 87 Tenn., 52, 56, 58, 9 S. W., 233.

It is now pretty generally agreed that reformation is the end to be attained by imprisonment.   This result cannot be reached unless the prisoner's will be enlisted in his own moral rehabilitation, nor unless he be given an opportunity to exercise his volition, and to

130 Tenn. 8

maintain himself. It is also quite essential that he shall be under some restraint, shall realize that he is in that position, and that he is under constant observation. It is also needful that he shall have guidance and assistance in his progress towards his new citizenship, and that he shall be protected from imposition. All of these purposes lie imbedded in the act we are examining. It would be truly a calamity if such beneficent ends should be defeated because of some supposed conflict with the constitution. It would be wholly impracticable for any court to exercise such authority. The legislature, while having the power to make rules or pass laws for the compassing of these ends, could not itself administer such a system; nor could the governor in the discharge of the duties of his office. It is possible only through the agency of some such board or commission as the present act provides. Compare *State, ex rel.,* v. *Evans,* 122 Tenn., 184, 191, 192, 122 S. W., 81. Furthermore, these powers, while neither judicial, legislative, nor executive, in the sense in which these terms are employed in discussions of constitutional law, belong to that great residuum of governmental authority, the police power, to be made effective, as is often the case, through administrative agencies. Compare *Richardson* v. *Young,* 122 Tenn., 471, 490-502, 125 S. W., 664.

The act does not trench on the governor's pardoning power. The language under which this question arises reads as follows:

"When such person on parole has kept the conditions thereof, in such manner and for such period of time as shall satisfy the board that he is reliable and trustworthy, and that he will probably remain at liberty without violating the law and that his release is not incompatible with the welfare of society, then said board may recommend to the governor that he grant to such prisoner a final discharge from confinement under such sentence, and thereupon the said board shall issue to such person a certificate of such final discharge," etc.

The language is somewhat obscure, but the meaning is that, where on application of the board the governor grants to the prisoner a final discharge, the board shall then issue a certificate of that fact. It is true the certificate may seem unnecessary after the governor grants a final discharge, but it is the permanent evidence of the prisoner's right to remain at large which the law bestows on him. Moreover, it preserves the history of the case, makes the record of the board complete, and operates as evidence in behalf of the discharged convict when he makes application for restoration to citizenship. The act continues, after the language last quoted:

"And [the board] shall also cause a record of the acts of said prisoner to be made, showing the date of his commitment, his record while in prison, the date of his parole, his record while on parole, and other reasons for his final discharge, together with any other facts which said board may deem proper; and a copy

. of such record certified to by the secretary shall be admissible as evidence in any proceeding in which such prisoner seeks restoration to citizenship.''

The discharge of the prisoner, under the circumstances stated, is not a pardon. The prisoner is in the same situation as one who has obtained a discharge through earning good time whereby the years . of his imprisonment have been lessened. The disabilities of the crime in respect of the rights of citizenship remain until removed by proceedings which the law has ordained for that purpose.

In our case of *Fite* v. *State,* 114 Tenn., 646, 88 S. W., 941, 1 L. R. A. (N. S.), 520, 4 Ann. Cas., 1108, referred to by counsel, the court had under examination section 18 of chapter 123, Acts of 1891 (Shan. Code, sec. 7423). This section provided that the workhouse commissioners might, on recommendation of the superintendent, deduct for good conduct a portion of the time for which any convict had been sentenced, or a portion of the fine, if a fine had been imposed. The credits to be allowed for good time earned were not more specific than as just stated. The court held that the section was unconstitutional because of the absence of a provision for such specific credits. ''The whole matter,'' said the court, ''is left to the arbitrary discretion of the board of workhouse commissioners. It is plainly a delegation of legislative authority, which renders this part of the workhouse law unconstitutional and void. In this respect section 18 of the workhouse law is wholly unlike the acts of 1869-70 and 1885, which

specifically prescribed the credits that are to be allowed, and which statutes have been enforced from time to time by the courts.''

The conclusion reached in the present case is not in conflict with *Fite* v. *State*. Under the statute before us, the prisoner, as we have explained, is, after the minimum term of the sentence has been served, if his conduct during the continuance of the minimum has been good, held as one under bail, and under observation, on parole, within fixed bounds, subject at all times and at any moment to be recalled into actual confinement within the walls of the penitentiary, until such time as by his conduct he shall convince the board and the governor that he can be, with safety to the public, permanently released. Upon the happening of this event, it is the duty of the board and of the governor to make such release—not a release for a part of the remnant of the maximum term of imprisonment fixed in the judgment, in the discretion of the board and of the governor, but for all of it. This means that the legislature has definitely fixed the amount of good time for which the prisoner shall have credit in full satisfaction of the judgment—the remnant of the maximum term left after the board and the governor have determined that the prisoner's conduct and demeanor have been good during the period of parole, according to the standard fixed by the statute.

There is, indeed, an element of uncertainty dependent on the fact that no one can know in advance how long the prisoner will remain on parole before giving

sufficient evidence of reformation. But there is the same element of uncertainty in arriving at definite amounts under good time statutes. No one can say in advance whether the prisoner's conduct will be such as to earn good time, or after earning it how much he will forfeit by subsequent bad conduct. The question always is whether he has at any given period already earned enough good time to pay for, offset, or cancel what remains unserved of his sentence. After his record, good and bad, has been conned, and it has been estimated how much good time is left to him on making proper reductions for bad time or misconduct, the measure is certain; that is, so much fixed by statute for each month or year of good time. The measure is equally certain under the statute before us. After the good conduct of the prisoner has been ascertained during the continuance of the parole, and declared by the board, and assented to by the governor, he is entitled by the terms of the statute to an acquittance for all of the residue of the maximum term of his imprisonment as fixed by the judgment of the court.

Perhaps it is unnecessary to add that the statute in question can in no sense impair the right of the governor to issue a pardon to any convict at any time he may deem it proper to do so in the discharge of that part of his official duties, whether the prisoner be on parole, or within the confines of the penitentiary. His power to pardon stands wholly outside of the powers of the board of prison commissioners, and can in no manner be subordinated or controlled.

Woods v. State.

The various grounds of unconstitutionality urged against the act being adjudged unfounded and no other reasons for reversal being assigned or apparent, the judgment of the trial court must be affirmed.