J. B. COHEN, Defendant-Plaintiff in Error, v. HOWARD LEE FERGUSON, By Next Friend, W. H. FERGUSON, Plaintiff-Defendant in Error. —336 S. W. (2d) 949.

Middle Section. December 4, 1959.

Certiorari Denied by Supreme Court May 4, 1960.

R. B. Parker, Jr., Sam L. Felts, Jr., Nashville, for plaintiff in error.

A. B. Neil, Jr., James C. Summers, Nashville, for defendant in error.

HICKERSON, J. Howard Lee Ferguson brought this suit for malicious prosecution against J. B. Cohen. The defenses were:

1. Defendant did not prosecute nor instigate the prosecution of plaintiff.

2. Defendant had probable cause for believing that plaintiff was guilty of the criminal offense for which he was indicted and prosecuted.

3. Defendant's actions in regard to plaintiff were not the result of malice.

After a full hearing, the jury could not agree. The parties and their attorneys, with the approval of the trial judge, entered into an agreement, by stipulation preserved in the bill of exceptions, page 300, that they would accept a majority verdict. The jury were divided seven to five. The majority were for plaintiff, and they fixed his damage at $1,000 compensatory and $500 punitive. The other five jurors were discharged pursuant to the agreement and had no part in fixing the damage.

Defendant made a motion for directed verdict at the close of all the proof and renewed the motion for directed verdict in his motion for new trial.

The trial judge overruled these motions and entered judgment on the jury verdict. Defendant appealed in error to this Court to review that judgment. There are only two assignments of error in this Court.

"1. The Court erred in overruling defendant's Motion for Peremptory Instructions made at the close of all the proof and in refusing to direct a verdict for defendant, because there was no evidence to permit a finding by the Jury for Plaintiff or to support a verdict for him.

"2. The Court erred in overruling defendant's motion to set aside the verdict of the Jury and the judgment entered thereon, and to direct a verdict

for defendant or, in the alternative, to grant defendant a new trial, because of the grave misconduct of the jury, as set forth in Ground Three of defendant's Motion for a directed verdict or in the alternative for a new trial and the affidavits filed in support thereof.''

(1) To dispose of the first assignment, we must answer the following questions:

1. Was probable cause shown as a matter of law?

2. Did plaintiff show the acts of defendant in connection with the prosecution of plaintiff were done through malice?

3. Did defendant prosecute or initiate the prosecution of plaintiff?

4. Did the trial court err in refusing to direct a verdict for defendant?

 The law of the case seems to be well settled. In F. W. Woolworth Company v. Connors, 142 Tenn. 678, 222 S. W. 1053, 1054, our Supreme Court clearly and concisely stated the law applicable to a suit for malicious prosecution with the citation of earlier cases of our Supreme Court to support the conclusions in the Connors case. We quote from the Connors case the rules applicable to the case on trial.

"In Kelton v. Bevins, Cooke, 90, 5 Am. Dec. 670, Judge Overton said: 'The public interest is concerned that offenses should not go unpunished. It is no test of the impropriety of such prosecutions that defendants are acquitted. The true and legal principle is, had the prosecutor ground to think that a

felony had been committed, with the information he possessed at the time of the commencement of the prosecution? If he had, he ought not to be subject to damages in this action. * * *

" 'To sustain an action for a malicious prosecution, there must not only be malice, but a want of probable cause. In the absence of either of these requisites, the action falls to the ground. Hence the want of probable cause for a prosecution is the test of this action. Though malice exists, if in the estimation of a rational and dispassionate mind there be probable cause for prosecution, the action cannot be sustained. With the information that Kelton possessed, he had reasonable ground to believe that a felony had been committed. He ought not, in justice and sound policy, to be mulct in damages and costs for endeavoring to detect and punish such offenses.'

"In the case of Raulston v. Jackson, 1 Sneed, 128, the court said: 'The law on this point is, and should have been so charged by the judge, that if the jury found from the proof that the defendant, at the time he instituted the prosecution, acted upon such a state of facts known to him, or derived from reliable information, as would induce a belief in the mind of a prudent, discreet man that the crime had been committed and by the person he was about to prosecute, he was not liable.

" 'The question is not whether the defendant is really guilty, but was there good and reasonable grounds for the prosecutor to believe he was. * * *

" 'Instead of requiring direct evidence of the fact of the crime, it may certainly often happen that

no crime was in fact committed, and yet the prosecutor justifiable, because of the existence of probable or reasonable, grounds to believe the criminal act had been done, and by the accused. If men were not allowed to act upon such grounds, crimes would often go unpunished for want of prosecutors. This action is only intended to apply to cases where a criminal accusation is made against an innocent man through malice, and in the absence of even a fair and reasonable probability of its truth.'

"In the case of Hall v. Hawkins, 5 Humph. 357, the court said: 'Probable cause is the existence of such facts and circumstances as would excite in a reasonable mind the belief that the person charged was guilty of the crime for which he was prosecuted; that is, acting upon the facts within the knowledge of the prosecutor, if a reasonable man would believe the party guilty of the crime charged, there would exist probable cause for the prosecution.' "

34 Am. Jur., 732, Malicious Prosecution, Section 47, states the same rule.

*"It is to be noted that the conduct of the defendant is to be weighed in view of what appeared to him at the time of instituting the prior proceeding, not in the light of subsequently appearing facts."* (Emphasis added.)

In Thompson v. Schulz, 34 Tenn. App. 488, 240 S. W. (2d) 252, 255, this Court said:

"The law of malicious prosecution represents an adjustment of two paramount social interests: the interest of society to prosecute the guilty, and the

interest of the individual not to be prosecuted wrongfully. It is not enough that the prosecution was unfounded; it must have also been malicious and without probable cause, to impose liability on the instigator of it. Poster v. Andrews, 183 Tenn. 544, 194 S. W. (2d) 337; F. W. Woolworth Co. v. Connors, 142 Tenn. 678, 222 S. W. 1053; Restatement, Torts, Vol. 3, pp. 380-411.

"Definitions of probable cause, however differently expressed, all agree in these two essentials: (1) The prosecutor must in good faith have honestly believed the accused was guilty of the crime charged; and (2) his belief must have been reasonable—based on facts and circumstances sufficient to lead an ordinarily prudent person to believe the accused was guilty of the crime charged. The prosecutor must have made the investigation an ordinarily prudent person would have made in the circumstances. Citty v. Miller, 1 Tenn. App. 1, 4-9; Citizens Sav. & Loan Corp. v. Brown, 16 Tenn. App. 136, 138-140, 65 S. W. (2d) 851, 853; Annotations, 5 A. L. R. 1688-1695, 65 A. L. R. 225; 34 Am. Jur., Malicious Prosecution, secs. 49-51; Restatement, Torts, Vol. 3, sec. 662, Comment g, p. 406.

"Malice need not be ill will, but may be any motive other than a purpose in good faith to bring an offender to justice. Malice may be inferred from a motive to enforce payment of a debt or the doing of some other act the prosecutor wishes done. Poster v. Andrews, 183 Tenn. 544, 551, 194 S. W. (2d) 337, 340; Restatement, Torts, Vol. 3, sec. 668."

■ The burden of proving malice and want of probable cause rests upon plaintiff in a malicious prosecution case. Wheeler v. Nesbitt, 24 How. 544, 16 L. Ed. 765; 34 Am. Jur. 775, 776, Malicious Prosecution, Section 123.

The authority last cited states this rule:

"The burden is always on the plaintiff to prove both malice and a want of probable cause, when an issue with respect thereto has been raised by the defendant."

(2) Bearing in mind that the foregoing rules of law apply to the case on trial, we shall here state the information, facts, and admissions of plaintiff which were before J. B. Cohen when he called the police and had them investigate the conduct of plaintiff. We emphasize the rule that we must consider the case at the beginning. Evidence subsequent to the beginning cannot be charged to defendant. J. B. Cohen operated a metal junk yard on the eastern bank of the Cumberland River, bounded on one side by Davidson Street. There was a high wire fence around three sides of the junk yard. The other side is bounded by Cumberland River. From time to time defendant had missed articles of junk which had been wrongfully taken from his yard. ·His employees reported to him that plaintiff and another boy had parked their car on the back side of the junk yard on September 17, 1958, about eight o'clock in the forenoon and had gone down the outside of the back fence; had entered the junk yard near the river; and had taken away from the junk yard, without paying for it, a tire or wheel and tire from an automobile, the property of defendant.

About nine thirty o'clock on the same morning his employees reported to defendant that the same two boys

had parked their car again at the same place as before; had gone down the outside of the back fence to the river; and had entered the junk yard from that position without the permission of defendant. Upon receiving this information, defendant called the police and asked them to make an investigation. Five or six officers, two detectives and policemen, responded to the call. Defendant and some of these officers and some of defendant's employees saw plaintiff trying to remove a bumper from one of defendant's junk automobile. They called for the boys to come up where defendant and the officers were. The boys came. Plaintiff had a socket wrench, ratchet, and two open-end wrenches on his person.

At that time and place and in the presence of eight or ten people, including the officers, plaintiff admitted he had taken the tire from the junk yard. He said he intended to get a car bumper and then pay defendant for it. The fact remains, however, that he entered the junk yard on the back side near the river and did not have any money on him.

Prior to the calling of the police and at the time they first answered the call, it appeared to defendant and the police officers that a crime was being committed, and this fact appears upon the uncontradicted facts and circumstances appearing at that time. Wherefore, the police took charge of plaintiff; took him to police headquarters; and arraigned him before a committing court who bound him over to the grand jury. He was indicated for an, "attempt to steal, take, and carry away certain automobile parts in a junk yard, a better description of which being to the grand jurors unknown."

Defendant did not go before the grand jury. The only time he testified in the case was in obedience to subpoenas. He never had any conversation about the case with the Attorney General's office. Plaintiff was acquitted on the regular trial in the criminal court.

Neither defendant, nor his employees, nor the police, knew plaintiff. None of them had any ill will towards him.

Bickford, Hansert, and Burt were trusted employees of defendant. They gave him the information which led to the calling of the police. He believed what they told him; and later defendant and the police officers personally saw plaintiff in the junk yard removing the bumper, and, as stated, heard him confess to the taking of the tire in the presence of all of them.

On all of the facts and information before J. B. Cohen when he called the police and when the police made their first investigation, there was probable cause, as a matter of law, which would lead defendant and the officers to believe that plaintiff was guilty of the crime for which he was later indicted. The burden was on plaintiff in the case on trial to prove want of probable cause. This burden was not carried by plaintiff. To the contrary, defendant went further than he was required to go in defense of himself. He proved there was probable cause by uncontradicted facts. It matters not what the proof developed on the regular trial of plaintiff in the criminal court. That was beside the point. As stated, defendant was judged by the facts, information, and circumstances as they appeared to him when he first made the investigation. Judged by that rule, defendant

proved a perfect defense by showing probable cause, as a matter of law; and we so hold.

■ (3) Did plaintiff prove defendant acted through malice as that term is used in the law of malicious prosecution?

In 34 Am. Jur., 729, Malicious Prosecution, Section 45, it is said:

"If the intention to bring the accused to justice is present, and its influence is controlling, the action of the prosecutor is not malicious although it may be influenced to some extent by other and forbidden considerations. A desire to deter others from committing crime by making an example of the offender is a proper motive."

We find no element of malice in the case on trial. Defendant merely wanted to stop plaintiff and others from taking parts from his junk yard. He had a right legally and morally to do this. Plaintiff's case must fail because he did not prove malice. Want of probable cause and malice must concur to make out a case of malicious prosecution. Plaintiff failed to prove either.

■ (4) Did defendant actually prosecute or initiate the prosecution of plaintiff?

54 C. J. S. Malicious Prosecution sec. 17, p. 970, provides:

"One who causes another's prosecution by false statements or misrepresentations, made to a police officer, with an improper motive, is liable for malicious prosecution, although he does not file a complaint or actually procure the prosecution. Where,

however, he discloses in good faith, to a police officer, or other public officer, all facts within his knowledge having a material bearing on the question of the guilt of the person suspected and leaves it to the officer to act entirely on his own judgment and responsibility as a public officer as to whether or not there shall be a criminal prosecution, he is not liable in an action for malicious prosecution by reason of the erroneous conclusion of the officer that the facts warrant him in instituting a criminal prosecution.''

The same rule is stated in Restatement of the Law of Torts, 383-384, Section 653.

''One who gives to a third person, whether public official or private person, information of another's supposed criminal conduct or even accuses such other thereof, causes the institution of such proceedings as are brought by the third person. The giving of the information or the making of the accusation, however, does not constitute a procurement of the proceedings which the third person initiates thereon if it is left to the uncontrolled choice of the third person to bring the proceedings or not as he may see fit.''

Defendant brings himself squarely within this rule. He was informed that the crime was being committed. He called the police to investigate. They came promptly, six strong, and made the investigation then and there. They took the case from that time themselves. Defendant did not appear before the grand jury. As stated, he only testified when he was compelled to do so by subpoena.

Plaintiff failed to prove that defendant prosecuted him. His suit must fail for that reason.

■ (5) Did the trial court err in failing to direct a verdict for defendant?

Having held that plaintiff failed to prove want of probable cause and malice, and further, that he failed to prove that defendant prosecuted him, it follows that the trial judge committed reversible error when he refused to direct a verdict for defendant and dismiss plaintiff's suit as upon a directed verdict.

That error will be corrected by this Court by directing a verdict here and the dismissal of plaintiff's suit upon such directed verdict in this Court.

(6) Finally, defendant contends a new trial should be granted him because of the misconduct of the jury in the jury room.

Having held the trial judge should have directed a verdict for defendant, and having entered judgment in this Court dismissing plaintiff's suit, as upon a directed verdict in this Court; the assignment in regard to the misconduct of the jury is never reached and becomes irrelevant in this Court.

Enter judgment in this Court dismissing plaintiff's suit as upon a directed verdict ordered in this Court. Tax all costs against the original plaintiff and the surety on his bond according to law.

Shriver, J., concurs.

Carney, J., (dissenting).

In my opinion there was sufficient evidence to take the plaintiff's case to the jury and his suit should not be dismissed. There are several material conflicts between the

testimony of the plaintiff and his witnesses and the testimony of the defendant and his witnesses:

(1) Plaintiff testified that he entered the defendant's junk yard through the front gate and was authorized by one of defendant's employees to look for a bumper for his car. The defendant's theory is that the plaintiff entered the junk yard from the back side of the junk yard next to the Cumberland River, without permission and surreptitiously.

(2) The defendant's witnesses testified that the plaintiff had been to the junk yard earlier on the same morning and had entered from the rear and carried off a tire and wheel and that he was removing the bumper on his second trip to the junk yard. The plaintiff denied this and insisted that he made only one trip to the junk yard on that day. He was corroborated by the testimony of his father as to the time he left home.

(3) The defendant, J. B. Cohen, and several of his witnesses testified that the plaintiff admitted to all of them that he had stolen the tire and wheel. The plaintiff admitted being charged with the theft of the tire but insisted that he denied the theft. From his testimony we quote as follows:

"Q. Then what happened after that, Howard? A. They said that the colored guy seen me steal a tire there that morning and carry it out the back way.

"The Court: Who was talking? Who told you that?

"The Witness: Mr. Cohen was the one that was talking, he said that a colored guy seen me take a tire out that morning at eight o'clock and go around

by the side of the fence and get in my car and drive off.

"Q. Was there a back gate? A. I couldn't say.

"Q. Go ahead. A. That he had seen me get a tire and carry it through some bushes.

"Q. What time did he say that happened? A. Eight o'clock. He said it was around eight o'clock.

"Q. Eight o'clock that morning? A. Yes sir, and go away in my car and then I came back at about nine-thirty.

"Q. Did he say what kind of car you had been in? A. No, sir.

"Q. Go ahead. A. Then I told him that it wasn't me and they asked me did I have any tires over at my house and I said, 'Yes, sir', and I carried them over there and showed them, I had two.

"Q. Now, who went over to your house? A. Mr. Cohen and two detectives."

Plaintiff's father consented for the defendant and the detectives to search his premises and the defendant, J. B. Cohen, did not identify either of the two tires found on the premises as being stolen from him.

(4) The plaintiff testified that Mr. Cohen told his father that if he would make the boy say he stole the tire he would drop the charge. Mr. Cohen denies this conversation but said that he merely told the boy's father that he should insist on him telling the truth.

(5) Plaintiff's father testified that when Mr. Cohen and the two detectives were searching his house for the tires,

with the father's permission, Mr. Cohen made the following statement: "If you don't make that boy say that he got some tires over at my place, I'm going to prosecute him to the fullest extent and try to put him in the penitentiary."

(6) Mrs. Ferguson, the mother of the plaintiff, testified that she had a conversation with the defendant, Mr. Cohen, in the hallway outside of the city courtroom and that Mr. Cohen stated to her that he was sorry that the matter had come up about the boy and that all he wanted him to do was to say that he took the tire and there would be nothing further to the proceedings. Mrs. Ferguson also testified that prior to the trial of the plaintiff in criminal court on the indictment charging him with the attempted theft of the bumper she had a conversation by telephone with Mr. Cohen. From her testimony we quote as follows:

"Q. Did he identify himself? A. He did. He said, 'This is Mr.'— He asked to speak to Mr. Ferguson and I said, 'Mr. Ferguson isn't at home.' So he said, 'Well, is this Mrs. Ferguson I'm talking to?' And I said, 'Yes'. He said, 'Well, this is Mr. Cohen.' And he asked me what we was going to do about the— He said the trial was to come up the next morning. I said, 'Yes, sir, I know it is.' And he said, 'Well,' was we going to let the trial go on or was we going to get it dismissed before it come up, he said, 'All I want the boy to do is to tell that he got the tire, and I'll have it dropped, the charges dropped,' and I says, 'Mr. Cohen, I can't make the boy say he got something that he didn't get,' I says, 'That's not doing him right.' And he told me, he

said, 'Well, if you don't have him say he got the tire and we dismiss it,' he said, 'I'm going to produce five witnesses to prove in Court in the morning that he did get it, but I see I can't do no business with you people.' "

(7) The plaintiff testified that his father had given him $5 with which to buy the bumper and that it was in a pocket in his T-shirt and that when the detectives and Mr. Cohen brought him home to search for the tire he got permission to change shirts before being taken to City Court and left the $5 in his T-shirt. The plaintiff's mother testified that she later found the $5 in the pocket of the T-shirt which the plaintiff had taken off.

In my opinion His Honor the Trial Judge properly submitted the cause to the jury and defendant's motion for a directed verdict was properly overruled. However, for the reasons hereinafter given I feel very strongly that the judgment entered in favor of the plaintiff should not be affirmed but that the cause should be remanded for a new trial.

I do not think there has been any valid jury verdict returned in this case upon which to base a valid judgment. It will be remembered that the jury reported to the court that it was hopelessly deadlocked and unable to agree. Thereupon, instead of declaring a mistrial, which I think he should have done, His Honor the Trial Judge, with consent of counsel for plaintiff and defendant, polled the jury and found that seven were for the plaintiff and five for the defendant. He dismissed the five jurors who had found in favor of the defendant and charged the remaining seven jurors to assess the plaintiff's damages which they laid at $1,500.

Very probably, His Honor the Trial Judge and counsel for the parties were influenced in their action by the second paragraph of Section 1499 of Tennessee Procedure in Law Cases, 1937, by Higgins and Crownover. For convenience we quote the entire section:

"Sec. 1499. Unanimity As To Verdict.—Where there has been no constitutional or statutory change in the common law rule requiring unanimity among jurors, the court is powerless to accept and record as a verdict the report of a fewer number than the twelve who compose the jury. Such a verdict is in general to be looked upon as absolutely void.

"But the litigants may expressly consent that the report of the majority may be received as the verdict of the jury, and such agreement and consent will be binding. If the records show the impaneling of a fewer number than twelve to try a case, and if this number appears in all minute entries pertaining to the functions of the jury, and if there is an entire absence of any objection to the participation of the smaller number, the presumption will be indulged that the parties consented that the case should be passed upon by the declared number of jurors.

"If there is a jury of twelve and one or more dissent from the report of the foreman at the time of his effort to declare the jury's verdict, the court is constrained to enter a mistrial or send the jury from the court-room with directions to give the case further consideration."

It is to be noted that no cases from any jurisdiction are cited by authors Higgins and Crownover to support

their statement that the parties can agree that a verdict of the majority of a jury will be binding.

In the case of McDonald v. McDonald, 1833, 13 Tenn. 307, our Tennessee Supreme Court announced the rule that a verdict by eleven jurors was defective and that therefore, the judgment based on such a verdict was defective. This was a civil suit.

In the case of Bell v. The State, 1857, 37 Tenn. 507, and Bowles v. The State, 1858, 37 Tenn. 360, our Tennessee Supreme Court reversed convictions in criminal cases because the records in each case showed that there were only eleven jurors.

T. C. A. Section 20-1309 provides as follows:

"20-1309. Disability of juror.—If, after the jury is impaneled, and before verdict, a juror becomes sick or otherwise disabled so as to be unable to perform his duty, he may be discharged by the court; and, in such case, unless otherwise arranged by the parties, the vacancy may be filled and the trial commenced anew, or the court may, in its discretion, order the jury to be discharged and a new one impaneled. In case of the disability of a juror or jurors, under this section, the cause may be tried and determined, by consent of parties, by the remaining jurors. (Code 1858, secs. 2962, 2963 (deriv. Acts 1817, ch. 99, sec. 1); Shan., secs. 4687, 4688; Code 1932, secs. 8814, 8815.)"

Article 1, Section 6 of the constitution of Tennessee provides as follows:

"Sec. 6. Trial by jury—Qualifications of jurors.— That the right of trial by jury shall remain inviolate,

and no religious or political test shall ever be required as a qualification for jurors.''

In the case of Willard v. State, 1938, 174 Tenn. 642, 130 S. W. (2d) 99, 100, our Tennessee Supreme Court held unconstitutional Chapter 68 of the Public Acts of 1939 reducing the number of jurors from twelve to six in certain misdemeanor cases. From said case we quote as follows:

"Section 6, Article 1, of the Constitution of this State provides: 'That the right of trial by jury shall remain inviolate * * *.' Our decisions hold that this constitutional provision protects the right of trial by jury only as it existed at common law in so far as it had been adopted and was in force in North Carolina, when the territory embraced in Tennessee was ceded by North Carolina to the Federal Government. Howard and Von Drake v. State, 143 Tenn. 539, 227 S. W. 36; Woods v. State, 130 Tenn. 100, 169 S. W. 558, L. R. A. 1915F, 531; State v. Sexton, 121 Tenn. 35, 41, 114 S. W. 494; Garner v. State, 13 Tenn. 160, 5 Yerg. 160, 176. The right of trial by jury is the right guaranteed to every litigant in jury cases to have the facts involved tried and determined by twelve jurors. Neely v. State, 63 Tenn. 174, 4 Baxt. 174, 180; Bowles v. State, 37 Tenn. 360, 5 Sneed 360.''

"At common law, the unanimity of the twelve jurors was an essential attribute of the verdict of a jury; and from the earliest period down to the time of the United States Constitution, unanimity of the twelve jurors alone constituted a legal verdict. The necessity of the unanimous concurrence of the twelve

jurors in the verdict governs in both civil and criminal cases where, under the principles of common law, such a verdict would have been required.

"The Seventh Amendment to the Federal Constitution guarantees the right of jury trial in the Federal courts, and similar guaranties are to be found in the state constitutions. The right of jury trial thus guaranteed is the right as it existed at common law at the time of the adoption of such constitutional provisions. The control which a state legislature has over the number of the jurors requisite to form a legal verdict in actions in the state courts depends upon whether right to trial by jury of twelve men in a particular case existed at the time of the adoption of the state constitution, and upon provisions of that constitution empowering the legislature to permit verdicts concurred in by less than all of the jurors. If at the time of its adoption the common-law rule requiring unanimity in the verdict was in force, the legislature cannot thereafter enact legislation permitting verdicts concurred in by less than all the jurors unless in the constitution itself there is some further warrant for the exercise of such legislative power * * *" 53 Am. Jur.—Trial —Section 1006—Unanimity; Majority Verdicts.

Apparently our Supreme Court has never passed upon the constitutionality of that portion of T. C. A. Section 20-1309 providing that in case of the disability of one or more jurors by consent of the parties, the trial may continue and verdict be rendered by less than the original twelve jurors. The only jury recognized by the common law of Tennessee at the time of the adoption of our

constitution was a twelve-man jury. Therefore, we doubt the constitutionality of that portion of Section 20-1309 providing for a trial by less than twelve jurors. However, it is not necessary to determine that question here because in this case there was a jury of twelve men.

The only jury verdict recognized by the common or statutory law of Tennessee at the time of the adoption of the constitution or subsequent thereto is a unanimous verdict. At no time has either the legislature or our Tennessee Supreme Court ever indicated any intention of departing to any degree from the common law rule requiring unanimity in jury cases. Time and time again this court has refused to weigh or consider the preponderance of the evidence because a jury of twelve men had unanimously reached a certain verdict and that verdict had been approved by the Trial Judge sitting as the thirteenth juror.

Contrast the force of such a verdict with the verdict in the present case which was agreed to by only seven jurors and diametrically opposed by five jurors. To allow such verdict to stand would necessarily, in my humble opinion, require the appellate courts to adopt a different rule for reviewing such cases on appeal and ultimately result in the appellate courts weighing the preponderance of the evidence.

We should be slow to change the ancient landmarks.

Every litigant in a civil case has the option to stand upon his constitutional right to a trial by jury or to waive such constitutional right. If he elects to have a trial by jury then the only legal verdict which that jury can return is a unanimous verdict. To permit the parties by agreement to have less than a unanimous verdict is

not to permit them to waive any of their rights but is, in effect, to permit them by consent to change and amend our judicial procedure. Such practices, if allowed to increase, could lead ultimately only to legal chaos. If the parties by consent could agree that a jury verdict could be less than unanimous, why could they not also agree that the clerk or sheriff could approve or disapprove the verdict as the thirteenth juror in the place and stead of His Honor the Trial Judge?

It is true that neither party in this case has assigned error on this question but the entire case is before this court upon an appeal in error duly perfected and this court must affirm, reverse or modify the judgment below. I think the judgment is void upon its face because based upon a void jury verdict and this court upon its own motion should reverse the judgment and remand the case for a new trial.

My two distinguished colleagues differ with me concerning the validity of the verdict of the jury. However, I feel that the question is of great importance to the bench and bar of Tennessee as well as to the public at large. With great deference to the opinions of my learned associates, I have expressed my views on this question in the hope that if a petition for writ of certiorari is presented the Supreme Court will rule upon the validity of a majority verdict. Especially do I think this question should be passed upon by the Supreme Court since Messrs. Higgins and Crownover cited no authority to sustain their opinion that a majority verdict is valid and binding when all the parties consent to be bound thereby.