Waco LAY, Appellant,

v.

STATE of Tennessee, Appellee.

Court of Criminal Appeals of Tennessee.

June 26, 1973.

Certiorari Denied by Supreme Court
Nov. 5, 1973.

Walker, P. J., concurred in result and filed opinion.

Galbreath, J., concurred and filed opinion.

Billy W. Townsend and D. D. Humphreys, Jr., Hohenwald, for appellant.

David M. Pack, Atty. Gen., William C. Koch, Jr., Asst. Atty. Gen., Nashville, J. Alonzo Bates, Dist. Atty. Gen., Centerville, William D. Young, Jr., Asst. Dist. Atty. Gen., Franklin, for appellee.

## OPINION

O'BRIEN, Judge.

Defendant was charged by a presentment in this case for assault to commit murder in the first degree. He was tried before a jury on a not guilty plea and was found guilty of assault with intent to commit murder in the second degree with maximum punishment fixed at three years. The trial judge entered judgment of confinement in the Penitentiary for an indeterminate period of not less than one nor more than three years. Motion for new trial was heard and overruled, and the matter is properly before this court on appeal.

Three questions are presented for resolution here based on the grounds submitted on the motion for new trial:

(1) Does the evidence or lack of evidence preponderate in favor of the innocence of the appellant?

(2) Was there a crime committed?

(3) Was the jury sentence of assault with the intent to commit second degree murder so excessive as to show passion, prejudice or caprice on its part?

We do not think the evidence in this case can sustain a conviction of assault to commit murder in the second degree.

The relevant evidence is this: Defendant, Waco Lay, is totally blind and has been so for ten or eleven years, prior to which he was partially blind for something more than twenty years. The brief filed on his behalf suggests his wife is blind also, but we find nothing in this record to substantiate that statement. Defendant is the parent of five children, ranging in age from seven to seventeen, all of whom resided with him and his wife in their home which was in a government housing project in Hohenwald, Tennessee, on October 17th, 1971.

On that date, sometime between 11:00 P.M. and midnight, Robert Hooks was driving in the vicinity of defendant's home trying to locate the residence of a friend. He was accompanied by David Gray. As they passed the residence of defendant, they saw a girl through a lighted window whom Gray recognized as defendant's fifteen year old daughter, Ann Lay. They stopped the car, went to the window, and asked her the location of the house they were seeking. After obtaining that information they departed, and found the house they had been looking for, which was close by. Hooks went into the house to talk with his friend and almost immediately Gray began walking back to town where he had left his own car and went on to work. Fifteen or twenty minutes later Hooks returned to his car and found Gray gone. He then drove his car back around to the Lay house and parked in the street, next to the curb. He had not previously been acquainted with Ann Lay, or any of her family. He went to the Lay house, which was some twenty-five feet from the street, and knocked on the door. The hour was close to midnight. The house was totally dark. Ann Lay, who had just come home from work about the time of the first visit by Hooks and David Gray, and who had not yet retired, answered the door.

Up until this point there appears to be no significant conflict in the evidence. As to subsequent events surrounding the actual shooting, it was Hook's testimony that when he returned to the Lay house about thirty or forty-five minutes after their first visit he knocked on the door and the girl answered. He asked her if she had seen David Gray or where he was, and she said she hadn't seen him. While this conversation was going on he was standing on the porch in front of a screen door. When he was informed by Ann Lay that Gray was not there, he asked if she had any idea where he might have gone. She said, "No, unless he had gone to an Aunt's house who lived in the vicinity." She did not know

this person's house number. He then asked what the woman looked like in case somebody else might know where she lived. He then heard a man yell out something in the back of the house and heard him coming through the house at the time. There was never any lights turned on. The man came to the door and asked him what he was doing there. Hooks informed him that he was looking for David Gray and was advised that Gray was not there. He was requested repeatedly to get on out of there. Hooks then inquired further about Gray and whether or not the man in the house had any idea where he might be, to which he received the response, "I don't know, I told you he was not here, leave, go on out of here." A couple of seconds later he saw a yellow flash and heard a gunshot. He was not able to see the man who was on the inside of the house, standing approximately three feet away. The only illumination was from a street light. Hooks was standing on the porch in front of a screen door. He heard two gun reports. He denies having taken hold of the screen door or making any attempt to enter the house. He was turning to leave when the shots were fired and acknowledged that he could have bumped into the door in the process. He had talked with Ann Lay for two or three minutes before the shots were fired. He received two wounds but it was never determined whether one round had glanced off his chin and gone into his neck or if he had been struck by two bullets.

Defendant's version is that the incident occurred about midnight. He was asleep. Something woke him and he heard the front door open. He got up to investigate. After putting on his shoes he stepped to the door of his bedroom which was next to the living room, and asked who it was. His daughter, Ann, said, "There is some man out there, I don't know who he is." "And I asked her I said what does he want?" and she said, "I don't know." "And I asked him three or four times what he wanted and if he ever answered me I never did hear it. I asked her what's wrong with him, is he drunk?" And she said, "Yes he is." Defendant further related, "And I asked him three or four times to leave after this, that's what scared me, and he didn't leave so I reached around on the chest of drawers and got my gun and walked over there to the door. I thought I'd get to the door and shut the door, I was sure the man meant harm of some kind and I got up towards the door, I never did get a hold of the door, the screen door jarred and I thought he had started in and I fired. However, I tried to fire where the sound wasn't but it didn't turn out that way." He stated, he didn't mean to hit him, he was alarmed for the safety of his family, and was frightened. As far as he knew it was dark. He had turned off the lights when he went to bed at about 10:30 P.M. The only others present when the shooting occurred was his daughter, and Hooks. He couldn't swear that Hooks grabbed the door, but the door jarred, and he took it that he had started in. At the same time Hooks said something but defendant was not sure what it was.

Ann Lay testified that just after she got home from work Gray and Hooks came around to the back of the house to the window and David asked her where someone named Brewer lived. After some discussion there the men left. As they were departing Hooks turned around and remarked, "Thank you, honey." Some forty-five minutes later she was lying on her bed reading when she heard a knock at the front door. She went to the door, attired in her pajamas, and finding the caller to be Robert Hooks, she asked him what he wanted and he inquired for David Gray. After some conversation between them about why he expected to find Gray at her home, and where he might in fact be, she requested him to leave. He declined to go, saying he had not found out what he wanted to know. She asked him again to leave, warning him that if her father got up and thought he was trying to come in, or something to that effect, he would probably shoot him. Hooks, "never did leave, he

just propped up against the door facing and just was standing there." The girl stated that this conversation took six or seven minutes, during the course of which she told Hooks he had better leave. The rest of her family was in bed. She was frightened, she was afraid of what he might do and also of what her father might do. When her father appeared, he asked Hooks his name and what he wanted. Her father told him he had better leave. He then asked her father where David was and was informed he did not know David, that David did not live there. Her father asked Hooks to leave about three or four times. Hooks said he hadn't found out what he wanted to know and wasn't going to leave. She was behind her father but heard a noise at the door which sounded like someone might be coming in just before the shots were fired.

There is some pertinent evidence in the record not directly related to the actual shooting. Hooks, who was twenty-six years of age and unmarried, had consumed several beers during the course of the day, but testified that it had been three or four hours since he had drunk anything. When he left Gray in his automobile, some thirty minutes before the shooting occurred, he knew Gray was working a midnight shift, and was depending on him to take him back to work. Defendant, who is fifty-three years of age, testified that he had been in trouble on two previous occasions, and served some time in the Penitentiary, for manslaughter and attempted murder. One of these occasions had been twenty-six or twenty-seven years before his trial and the last one had been fourteen or fifteen years prior.

There are some other bits of evidence, all of which, taken separately or in conjunction with that summarized here are not sufficient to raise the offense with which defendant is charged to a degree warranting conviction for an attempted homicide which requires malice as an essential ingredient.

It is not disputed that Robert Hooks was shot by defendant. It is the theory of the defense that there is little contradiction in the evidence surrounding the actual shooting, and under all the circumstances, Hooks presence at defendant's home, his attitude, and actions constituted a threat of death or great bodily harm to appellant's family, and defendant fired in honest apprehension of this danger.

The State contends that defendant has the burden of proving why the conviction for assault with intent to commit second degree murder should be reduced to manslaughter under the authority of Thomas v. State, 210 Tenn. 297, 358 S.W.2d 315, and Bunch v. State, 3 Tenn.Cr.App. 481, 463 S.W.2d 956; and not having carried this burden at the trial, his conviction should not be reversed on appeal. We do not find that preponderance of evidence in this case which was determined to be sufficient to warrant the convictions in the cases cited.

■■ The presence of malice, is essential to sustain the conviction for second degree murder. The only element of malice to be found in this record is the fact of the use of a deadly weapon in the alleged assault. We do not think the surrounding and accompanying circumstances are sufficient to sustain the presumption of malice by the use of a gun in this case.

The defendant was in his own home, the sole protector of his domicile, and his family, when an intruder came upon the premises in the middle of the night and after repeatedly being admonished to leave, without denial, he jarred the screen door, the only barrier which stood between the sightless defendant and an unknown and imminently impending danger. The very presence of Hooks under the circumstances then and there existing posed a threat to the defendant, his home and family which he attempted to avert by admonishing him to leave. If the sudden and unexpected jarring of the screen door was sufficient to put the defendant in apprehension of

danger of death or great bodily injury to himself and his family, then we must determine if his act in shooting Hooks exceeded that of a man of reasonable discretion in the prevailing situation.

The rule in this State is set forth in Wooten v. State, 171 Tenn. 362, 103 S.W. 2d 324, citing from Wharton on Criminal Law as follows:

"Mr. Wharton, in his Criminal Law, states the rule to be that 'for the master of a house knowingly to kill a visitor, is murder.' But he draws the distinction between such a killing in cool blood, which is murder, and in hot blood, which is manslaughter, and he excepts from criminal liability altogether a master who, on reasonable grounds, apprehends that the entrance is with a felonious or violent purpose, Volume I, sections 594, 595. And in sections 635 and 636 this learned author emphasizes the right of one to resist to the death an invasion of his home, 'a man's house, however humble, is his castle, and his castle he is entitled to protect against invasion.' But, he adds, this right 'cannot be extended so as to excuse the killing of persons not actually breaking into, or violently threatening a house. Nor is killing justifiable for the prevention of a trespass or nonfelonious entrance when there is no attempt to force a way in against the owner's prohibition. In such cases the offense is manslaughter.' "

In *Wooten*, supra, a woman directed her son to shoot her brother who was forcing his way through the screen door of her dwelling, under circumstances much less indicative of provocation than we have here. The Supreme Court found that Mrs. Wooten's conviction of a degree of homicide above manslaughter was not sustained.

The opinion in Morrison v. State, 212 Tenn. 633, 371 S.W.2d 441, while reversing the case on other grounds, discusses the limitations which apply in *Wooten*, supra, and which we consider to be applicable to the facts here.

In Thomas v. State, 210 Tenn. 297, 358 S.W.2d 315, defendant was found guilty of second degree murder under factual circumstances which left no other conclusion than that the killing was deliberate.

In Fox v. State, 1 Tenn.Cr.App. 308, 441 S.W.2d 491, Mrs. Fox was convicted under two separate indictments, one charging assault with intent to commit first degree murder and the other charging first degree murder. In that case the first victim was injured and the second killed. The jury found her guilty of simple assault and battery in the first case and second degree murder in the second. The absence of evidence of malice, and the presence of provocation are much more evident in the case before us.

We do not find here any correlation with the facts of the homicide in Bunch v. State, 3 Tenn.Cr.App. 481, 463 S.W.2d 956, which warranted a conviction of murder in the second degree.

Under a fairly similar state of facts as we find here, in Smith v. State, 212 Tenn. 510, 370 S.W.2d 543, the defendant heard a noise and saw the "bulk of something" in the dark coming toward him with a flashlight, and thinking it might be a robber engaged in a burglary or a prowler about to do violence to him, became excited and emptied his pistol, firing seven times in the direction of the figure in the dark. The jury convicted Smith of murder in the second degree. Our Supreme Court ruled that his actions under the stress of excitement, and without "malice aforethought" negatived the charge of murder in the second degree and modified the judgment to adjudge the defendant guilty of involuntary manslaughter. Of course, there can be no such offense as an attempt to commit involuntary manslaughter.

In this case, a conversation of sorts was going on between defendant and Hooks. While we take cognizance of defendant's blindness, we cannot speculate that this physical handicap would justify him exercising less caution than a sighted person

under the circumstances when it might as easily be said it was incumbent upon him to take greater precautions because of it.

If this defendant had, in the course of his conversation with Hooks, advised him that he was armed, and voiced some prohibition to his entry, or informed him that any attempt at entry would be at his own peril, we would be required to take a different view of the situation here. Under the circumstances existing we think defendant is guilty of a degree of culpable negligence which sustains a conviction of an attempt to commit voluntary manslaughter.

However, in reducing the conviction to an attempt to commit voluntary manslaughter, which we must do under the evidence in this case, we are faced with a problem of a different complexion. The penalties for assault to commit murder in the second degree, and assault with intent to commit voluntary manslaughter are both prescribed under T.C.A. Sec. 39-603 to be, "imprisonment in the penitentiary not exceeding five (5) years, or, *in the discretion of the jury*, by imprisonment in the county workhouse or jail not more than one (1) year, and by fine not exceeding five hundred dollars ($500.00)." (italics added)

In Corlew v. State, 181 Tenn. 220, 180 S.W.2d 900, our Supreme Court enunciated the rule we follow here in correcting an error in jury conviction of a higher grade or degree of an offense than supported by the evidence. After a study of the authorities we conclude that we may not reduce the sentence as was done in that case. In the *Corlew* case the defendant was convicted by the jury of grand larceny with a maximum sentence of three years. It was conceded that the evidence could not sustain the conviction. The Supreme Court reduced the conviction to guilty of petit larceny and fixed his penalty at the one year minimum for that offense on the premise that the power of commutation to fine and imprisonment in the county workhouse in larceny cases was *vested in the court*, not in the jury, under the provisions of Code Section 10934, (Now T.C.A. Sec. 39-4205), and the result could not be more favorable to defendant if the cause was remanded for the jury to fix the sentence.

It is obvious that this aspect of the *Corlew* ruling is not applicable in a case such as this where the statute particularly provides that any commutation of the sentence shall be in the discretion of the jury, and the jury could fix the penalty at any period of time within the limits set by the statute, down to a minimum of one day, plus the fine prescribed in cases of commutation.

We think the principles delineated in Huffman v. State, 200 Tenn. 487, 292 S.W.2d 738, apply here. In that case the jury found defendant guilty of assault with intent to commit voluntary manslaughter under an indictment which charged a lesser degree of offense. As stated there, where it is the prerogative of the jury to fix the penalty for the offense of which the proof admits we have no alternative except to remand. When a defendant has had a fair trial by an impartial jury and his guilt established, his right to a trial by jury has been guaranteed, and there is no denial of any constitutional protection if a separate jury fixes his punishment. The precedent has been clearly established in this State. See Huffman v. State, supra; State v. Davis, 3 Tenn.Cr.App. 625, 466 S.W.2d 237.

The case is remanded to the trial court for the fixing of punishment in accordance with the criteria set forth in Huffman v. State, supra.

WALKER, P. J., and GALBREATH, J., concur.

WALKER, Presiding Judge (concurring).

I concur in the result.

I do not agree that it is necessary to remand this case for fixing punishment by

the jury. In Bowen v. State, Tenn., 488 S.W.2d 373, our Supreme Court considered the effect of the Governor's commutation of the death penalty to 99 years' imprisonment. In holding that the petitioner could not be heard to complain at the reduced sentence, the court discussed the power of the court to enter the correct judgment in a criminal case under Corlew v. State without a remand. It said:

". . . (T)he principles settled by *Corlew* case could be used to reach the same conclusion. In that opinion the Court said:

> " 'Assessment by the jury of the punishment upon conviction is not a right reserved to the jury by the Constitution. "The right to have the jury assess the punishment was not a part of the right of trial by jury at common law." Woods v. State, 130 Tenn. 100, at page 107, 169 S.W. 558, at page 559, L.R.A.1915F, 531 citing Durham v. State, 89 Tenn. 723, 18 S.W. 74, and cases from other jurisdictions.

> \*   \*   \*   \*   \*   \*

> " 'It may be added that such practice (that of the Supreme Court fixing a reduced penalty when required to do so by the record before it or by law) is well established in civil cases, both in the trial Courts and in this Court, Branch v. Bass, 37 Tenn. 366; Railroad Co. v. Roberts, 113 Tenn. 488, 82 S.W. 314, 67 L.R.A. 495; and the power of the appellate courts to modify and reduce imprisonment in criminal cases, and "render such judgment on the record as the law demands," Code, Sec. 11810, is quite generally recognized and exercised. See Annotations, 29 A.L.R., 318, and 34 A.L.R., 1477, 1486, 1487.'

"While this Court did not apply these principles to the fullest extent it might have applied them in the *Corlew* case, choosing instead to reduce the penalty from a maximum sentence of three years for grand larceny to the minimum sentence of one year for petit larceny, it might have done otherwise."

Under these principles I would reduce the punishment to one year in the penitentiary.

GALBREATH, Judge (concurring).

I concur in Judge O'BRIEN's opinion.

From the facts and circumstances of this case, I would strongly recommend that the trial judge consider favorably any application on behalf of the defendant for probation. Indeed, it is my opinion, which may or may not be shared by my colleagues, that if nothing more adverse is developed by way of an investigation on the feasibility of granting a suspended sentence than what appears in the record now before us, it would be an abuse of discretion not to grant judicial clemency.