IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 12, 2006

## STATE OF TENNESSEE v. JIM CORBETT CORDER

**Appeal from the Criminal Court for White County**
**No. CR001920     Leon C. Burns, Jr., Judge**

-----

**No. M2005-02860-CCA-R3-CD - Filed February 26, 2007**

-----

The defendant, Jim Corbett Corder, was convicted of attempted voluntary manslaughter and sentenced to four years in prison. On appeal, the defendant argues that the evidence is not sufficient to support his conviction. We conclude that the evidence is sufficient and affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Billy K. Tollison, McMinnville, Tennessee (at motion for new trial and on appeal); Joe L. Finley, Jr. (at trial) for the appellant, Jim Corbett Corder

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; William Gibson, District Attorney General; Beth Willis, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

In September 2004 the defendant, Jim Corbett Corder, was indicted by a White County grand jury on one count of attempted second degree murder. Following a jury trial in January 2005, the defendant was found guilty of the lesser-included offense of attempted voluntary manslaughter. The defendant filed a motion for a judgment of acquittal and motion for new trial in March 2005; this motion was denied, and the defendant was sentenced to four years in prison as a Range I standard offender. The defendant appeals his conviction, arguing that the evidence presented at trial is insufficient to support a jury verdict of guilty on the attempted voluntary manslaughter charge. This court concludes that the evidence was sufficient to support a guilty verdict and affirms the judgment of the trial court.

FACTS

On July 25, 2004, Thomas Christopher "T.C." Parks was watching television with a friend, Kenneth Kirby, at a White County house that Parks shared with his parents. Parks testified that he saw a light blue flat-bed truck pass by his house. A few minutes later, Parks heard gunshots and went outside to investigate. He discovered a bullet hole in the bed of Kirby's pickup truck, which was parked outside the house. Parks testified that he then drove his own pickup truck to the end of the road, where he blocked the road by placing his truck across the road, with the driver's side facing the road. Parks stated he did this so the person who shot at his parents' house could not escape. Parks, who claimed that he did not have a gun with him when he left his parents' house, then exited the vehicle and hid behind the rear wheel on the passenger's side. Parks claimed that he then stood and saw a man yelling profanities at him and pointing a gun in Parks' general direction. Parks then testified that he sat back down behind the rear passenger wheel; shortly thereafter, he heard a shot ring out and then felt a pain in his lower groin. Realizing that he had been shot, Parks then got in his vehicle and drove back to his parents' house. In the process, Parks passed the gunman, who Parks claims fired additional shots at the truck, hitting it once. After arriving at his parents' house, Parks' parents called 911, and Parks was transported to a local hospital.

At trial, both Parks and his father testified that nobody from the Parks family had ever interacted with the defendant prior to the incident of July 25, 2004, and that neither father nor son even knew the defendant's name prior to the day in question. Parks' father and Kirby both testified that they heard the initial gunshots and saw the bullet holes in Kirby's car. The two men also agreed that T.C. Parks did not take a gun with him when he went to block the end of the road. Like his son, Parks' father testified that he did not know the identity of the shooter at the time of the incident.

The defendant's testimony at trial portrayed a different picture of the interaction between Parks and the defendant, both before and during the day in question. The defendant noted that on one occasion shortly before the incident leading to his arrest, the defendant invited a young man and his girlfriend to the defendant's camper trailer for a cookout. The defendant stated that the young woman was using the restroom in the bushes when Parks drove by and, upon seeing the woman, backed his truck up several times, spinning the tires. Seeing this, the defendant yelled at Parks, telling him to leave. Shortly thereafter, the defendant noticed some building materials, including some cinder blocks and some 2x4s, were missing from the yard outside his camper trailer. The defendant noticed some 2x4s and cinder blocks outside the Parks residence; the defendant testified that he was unable to positively identify the materials as his, but he nevertheless believed the materials were his. The defendant went to the Parks residence to confront T.C. Parks, who the defendant claimed came outside the house with a shotgun, pointed it at the defendant, and told the defendant that he (Parks) could do anything he wanted to do.

The defendant testified that on the day of the incident, he did not go near the Parks residence and he did not shoot at it. Rather, the defendant claimed that he and a friend, David Stonebreaker, were shooting guns at some beer cans outside the defendant's trailer. While the two men were outside, the defendant claimed he heard some activity from the road and went to the road to see what

was happening. The defendant testified he saw a truck pull across the road a few feet from his driveway, and that a man got out of the truck with a shotgun. The defendant then stated the gunman got back in his truck, moved it a slight distance, then got out of the truck and crouched behind it. After witnessing the gunman do this act several times, the defendant walked to the end of his driveway and asked the man "what the hell are you doing?" The defendant stated that the gunman then pointed his gun at the defendant and said "we have got you now." The defendant stated that the gunman then laughed at the defendant. The defendant said he was not completely sure of the gunman's identity at the time of the incident, but he believed the gunman was T.C. Parks. The defendant then testified that the gunman crawled back and forth several times behind the truck, occasionally standing and pointing his weapon at the defendant. After this activity went on for a while, the defendant claimed he asked Stonebreaker for a gun, which Stonebreaker gave to the defendant, and the defendant shot under the truck in an attempt to scare off the gunman. The defendant then claimed he saw the gunman put his gun in the back of his truck and drive off. The defendant stated he shot twice more at the truck after the driver attempted to run over the defendant.

Jack Bulakowski, an officer with the White County Sheriff's Department, testified that he was dispatched to the Parks home to investigate the shooting the evening it occurred. Bulakowski testified that Parks' father identified the defendant as the shooter and gave a description of the defendant's blue and silver flat-bed truck. As Bulakowski drove through town later that evening, he noticed a truck matching the description of the defendant's vehicle. At that point, Bulakowski followed the truck to a restaurant and called for backup. After the truck and the officer entered the parking lot, the officer activated his blue lights. The officer then placed handcuffs on Stonebreaker (the driver), and the passenger, who Bulakowski knew from prior encounters as the defendant. The defendant pointed the officer to a toolbox, in which Bulakowski found a pistol and a .22 caliber rifle.

At that point, Detective Chris Isham with the White County Sheriff's Department arrived at the restaurant. Earlier in the evening, Isham had interviewed Parks at the hospital and conducted a gunshot residue test on his hands. He also had searched Parks' truck but found no weapons. At the restaurant, Isham identified himself to the defendant, to which the defendant (who Isham believed was intoxicated) replied, "I shot the mother-f—er." Isham then Mirandized the defendant and asked him to remain silent. Isham also testified that he performed gunshot residue tests on Stonebreaker and the defendant. These gunshot residue kits, along with the one conducted on Parks, were sent to the Tennessee Bureau of Investigation (TBI) for further analysis.

James Davis with the TBI testified that he conducted tests on the three gunshot residue kits that Isham had sent to the TBI. Parks' test was inconclusive, but the tests on the other two men were both positive for gunshot residue.

## ANALYSIS

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond

a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict. Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Attempted voluntary manslaughter requires the attempted intentional or knowing killing of another "in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. §§ 39-12-101; 39-13-211(a) (2003). Regarding the requisite mental states, a person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result," while a person acts knowingly "when the person is aware of the nature of the conduct or that the circumstances exist," or "when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(a)-(b) (2003). A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(2) (2003).

A determination of whether "adequate provocation" existed at the time of the offense is left to the jury. See State v. Johnson, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995); State v. Dennis Hodges, No. W2004-02716-CCA-R3-CD, 2005 WL 2372754 at *4 (Tenn. Crim. App. Sept. 27, 2005). In this case, Parks testified that he drove to the end of the road in front of the defendant's house and then parked his truck across the road, blocking it. The defendant testified that after Parks blocked the road, the defendant and Parks engaged in an argument before Parks pointed his gun at the defendant and began a pattern of crawling around behind the truck and then standing and pointing his gun at the defendant. Taken in the light most favorable to the state, a jury could conclude that these actions constituted adequate provocation for purposes of the voluntary manslaughter statute.

The defendant argues that he fired under Parks' truck to scare him off, and that the defendant fired at the truck in self defense as Parks drove away. However, the defendant's actions appear to this court to be the actions of a man intending to kill someone, as is required to sustain a conviction of attempted voluntary manslaughter. A similar finding was reached by this court in Lay v. State, 501 S.W.2d 820 (Tenn. Crim. App. 1973). In Lay, the defendant, a blind man, awoke late one night to find his daughter talking with a man outside the defendant's residence. Id. at 822. The defendant repeatedly asked the visitor to leave, which the visitor refused to do. Id. A short time later, the defendant heard his door rattle, at which point the defendant fired in the direction of the door, not meaning to hit the visitor. Id. Nevertheless, the defendant's shot hit the visitor. Id. In rejecting the defendant's self-defense claim and stating the evidence supported a conviction for attempted voluntary manslaughter, this court stated:

> If this defendant had, in the course of his conversation with [the visitor], advised him that he was armed, and voiced some prohibition to his entry, or informed him that any attempt at entry would be at his own peril, we would be required to take a different view of the situation here. Under the circumstances existing we think defendant is guilty . . . of an attempt to commit voluntary manslaughter.

Id. at 825.

The facts of this case are somewhat similar to those presented in Lay. As Parks went through his pattern of crawling behind the truck and occasionally standing up, the defendant did not attempt to speak to Parks or discern the reasons behind Parks' actions. Nor did the defendant go inside his house or call the police. Rather, he stood at the end of his driveway watching the events and asked his friend Stonebreaker to give him a gun. And while the defendant claims that he fired his weapon in an attempt to scare off Parks, the defendant did not shoot into the air or in a direction away from the truck—he shot under the truck in the direction of Parks, who the defendant knew was crouching behind the truck. Furthermore, the defendant admitted shooting at Parks' truck as Parks drove away, and the defendant readily admitted to a police officer that he (the defendant) shot Parks. Such evidence makes clear that the defendant intended to kill Parks when the defendant shot at Parks. This mental state, coupled with the provocation outlined above, was adequate for the jury to find the defendant guilty of attempted voluntary manslaughter.

## CONCLUSION

Parks' actions adequately provoked the defendant for purposes of the voluntary manslaughter statute, and the defendant's firing several times at Parks shows that the defendant had the intent to

kill as required under the criminal attempt statute.  As such, the evidence was sufficient to support a conviction for attempted voluntary manslaughter.  The judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE